OPINION BOSSON, Justice. {1} New Mexico law requires a trial judge to hold an evidentiary hearing to determine whether a juvenile, adjudicated as a youthful offender for having committed certain serious criminal offenses, is “amenable” to treatment or rehabilitation in juvenile facilities or should be sentenced to prison as an adult. See NMSA 1978, § 32A-2-20 (1993) (amended 2009). Our courts have labored for years debating whether the Sixth Amendment right to a jury trial requires the amenability determination to be made by the jury or by the trial judge as the statute provides. See State v. Gonzales, 2001-NMCA-025, 130 N.M. 341, 24 P.3d 776, overruled by State v. Rudy B., 2009-NMCA-104, ¶ 53, 147 N.M. 45, 216 P.3d 810. {2} On the basis of U.S. Supreme Court precedent recently issued in Oregon v. Ice, 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009), we now conclude that the Sixth Amendment does not require a jury determination, and thus, we uphold from constitutional challenge New Mexico’s statutory preference for judge-made amenability decisions. In so doing, we reverse the recent contrary opinion of our Court of Appeals and remand for further proceedings. BACKGROUND {3} The Court of Appeals succinctly described the events resulting in the prosecution of Rudy B. (“Child”) in this case. “Child was involved in a gang fight in a parking lot. Under the impression that one of the other gang members had a gun, Child pulled out his own weapon and began shooting. He hit three people, one of whom was rendered a quadriplegic.” Rudy B., 2009-NMCA-104, ¶ 2, 147 N.M. 45, 216 P.3d 810. {4} The State then filed a petition in children’s court against Child, seventeen years old at the time, alleging various youthful offender offenses and potentially subjecting him to an adult sentence. Soon thereafter, the State filed notice of its intent to seek adult sanctions and obtained a grand jury indictment, charging Child with three counts of shooting from a motor vehicle (great bodily harm), three counts of aggravated battery (deadly weapon), and one count of unlawful possession of a handgun by a minor, and one count of tampering with evidence. Prior to trial, Child pleaded guilty to two counts of shooting from a motor vehicle (great bodily harm) and to two counts of aggravated battery (deadly weapon) (firearm enhancement). In return, the State agreed to drop the remaining charges. {5} The plea agreement specified that Child was to be sentenced after an amenability hearing that would be held “pursuant to [Section] 32A-2-20.” Section 32A-2-20 requires a trial judge to hold an evidentiary hearing to determine whether a juvenile adjudicated as a youthful offender should be sentenced as a juvenile or as an adult. To sentence a youthful offender as an adult, the trial judge must make two findings (collectively “the amenability determination”): “(1) the child is not amenable to treatment or rehabilitation as a child in available facilities; and (2) the child is not eligible for commitment to an institution for children with developmental disabilities or mental disorders.” Section 32A-2-20(B). The statute provides a list of factors for the trial judge to consider in light of the evidence presented at the amenability proceeding. Section 32A-2-20(C).[1] {6} Child’s agreement further explained that, depending on the outcome of the amenability proceeding, he faced either a juvenile disposition until the age of twenty-one with the Children, Youth & Families Department, or an adult sentence of up to twenty-six years with the Department of Corrections. The agreement also contained a provision in which Child waived “all motions, defenses, objections, or requests” regarding the judgment against him, and “specifically waivefd] his right to appeal as long as the Court’s sentence [was] imposed according to the terms of [the] agreement.” {7} At the amenability hearing, the trial judge heard conflicting evidence regarding Child’s amenability to treatment or rehabilitation as a juvenile in available facilities. At the conclusion of the hearing, the trial judge explained that her decision as to Child’s amenability would turn primarily on “the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available,” given that Child was eighteen at the time of the hearing. Section 32A-2-20(C)(7). She further explained that the parties had not done an adequate job of educating her regarding the programs and facilities available to treat or rehabilitate Child by the time he reached twenty-one. Because the trial judge felt incapable of rendering an informed decision, she deferred her ruling on Child’s amenability until the parties could present additional evidence regarding the available treatment or rehabilitation options. {8} Based on the evidence presented at a subsequent hearing, the trial judge concluded that no suitable facilities or services were available to treat or rehabilitate Child to a level that would adequately protect the public by the time he turned twenty-one. Consequently, the judge found that Child was not amenable to treatment or rehabilitation as a child in available facilities, and that he was not eligible for commitment to an institution for children with developmental disabilities or mental disorders. The judge imposed an adult sentence of twenty-five years imprisonment with the Department of Corrections. {9} On appeal, our Court of Appeals reversed, holding Section 32A-2-20(B) and (C) facially unconstitutional because its amenability determination was made by a judge and not the jury. Rudy B., 2009-NMCA-104, ¶ 53, 147 N.M. 45, 216 P.3d 810. In so doing, the Court relied on a string of Sixth Amendment decisions of the U.S. Supreme Court reaching back to Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Rudy B., 2009-NMCA-104, ¶¶ 15-19, 147 N.M. 45, 216 P.3d 810. The Court overruled its prior opinion in Gonzales, 2001-NMCA-025, 130 N.M. 341, 24 P.3d 776, which had arrived at the opposite conclusion with regard to these same amenability determinations. See Rudy B., 2009-NMCA-104, ¶¶ 34-35, 53, 147 N.M. 45, 216 P.3d 810. We granted certiorari to address important and timely constitutional issues under the Sixth Amendment as they affect our statutory process for adjudicating juveniles charged with serious criminal offenses. See State v. Rudy B., 2009-NMCERT-009, 147 N.M. 423, 224 P.3d 650. DISCUSSION {10} The State raises two issues on appeal. First, the State contends that the Court of Appeals did not have jurisdiction to consider Child’s constitutional challenge to Section 32A-2-20 because Child waived his right to appeal in the plea agreement. Second, the State argues that the Court of Appeals erred when it declared Section 32A-2-20 unconstitutional, largely because it improperly applied the U.S. Supreme Court’s recent opinion in Ice, 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517. We address each argument in turn. The Court of Appeals had jurisdiction over this case. {11} The State maintains that Child’s explicit waiver of his right to appeal divested the Court of Appeals of jurisdiction to consider his constitutional challenge to Section 32A-2-20. The State’s argument is essentially that appellate jurisdiction rests on the status of an appellant as an “aggrieved party,” and that Child “agreed not to be aggrieved” when he waived his right to appeal. See N.M. Const, art. VI, § 2 (“[A]n aggrieved party shall have an absolute right to one appeal.”). We find the jurisdictional argument unpersuasive. {12} The State does not cite, and we cannot find, any authority to support the proposition that a waiver in a plea agreement of the right to appeal divests the Court of Appeals of jurisdiction to hear an appeal in a criminal proceeding. The two cases on which the State relies merely illustrate the well-established principle that a voluntary plea of guilty or nolo contendere “ ‘ordinarily constitutes a waiver of the defendant’s right to appeal his conviction on other than jurisdictional grounds.’ ” State v. Chavarria, 2009-NMSC-020, ¶ 9, 146 N.M. 251, 208 P.3d 896 (quoting State v. Hodge, 118 N.M. 410, 414, 882 P.2d 1, 5 (1994)); see also id. (limiting review to the question of whether the trial court had jurisdiction to sentence the defendant to life in prison, rather than reaching the merits of the defendant’s Eighth Amendment challenge to his life sentence); State v. Michael S., 1998-NMCA-041, ¶ 11, 124 N.M. 732, 955 P.2d 201 (declining to address the child’s substantive appellate arguments because they were not based on jurisdictional grounds). These cases do not hold, however, that such a waiver in a plea agreement divests an appellate court of jurisdiction to entertain that appeal. {13} At bottom, a plea agreement is simply a contract between the State and an accused that affects the rights of the parties but not the court’s jurisdiction, which is a creature of statute and the state constitution. See State v. Simmons, 2006-NMSC-044, ¶ 12, 140 N.M. 311, 142 P.3d 899 (“We address the plea agreement as a unique form of contract, binding upon both parties, relying on the rules of contract construction.”); State v. Montaño, 2004-NMCA-094, ¶ 7, 136 N.M. 144, 95 P.3d 1059 (“A plea agreement is a form of contract between the State and a defendant.”). A provision of a plea agreement waiving the right to appeal is binding on the parties to the same extent that any contractual provision binds the parties to a particular term of a contract. {14} Subject matter jurisdiction, on the other hand, implicates a court’s “power to decide” the issue before it. State v. Bailey, 118 N.M. 466, 469, 882 P.2d 57, 60 (Ct.App. 1994). Put another way, “the term ‘jurisdictional error’ should be confined to instances in which the court was not competent to act.” State v. Orosco, 113 N.M. 780, 783, 833 P.2d 1146, 1149 (1992). A court’s jurisdiction derives from a statute or constitutional provision. See State v. Smallwood, 2007-NMSC-005, ¶ 6, 141 N.M. 178, 152 P.3d 821 (“[0]ur Constitution or Legislature must vest us with appellate jurisdiction.”). {15} With respect to this ease, the Legislature vested the Court of Appeals with subject matter jurisdiction over “criminal actions, except those in which a judgment of the district court imposes a sentence of death or life imprisonment.” NMSA 1978, § 34-5-8(A)(3) (1983). Child’s waiver of his right to appeal does not transform this proceeding into something other than a “criminal action.” Nor did the trial court impose a sentence of death or life imprisonment. Hence, Child’s waiver does not implicate the “power” or “competen[ce]” of the Court of Appeals to consider his ease. {16} The State did not raise the issue of Child’s waiver of his right to appeal to the Court of Appeals, nor did it raise the issue to this Court in its petition for certiorari. Consequently, because this is neither a jurisdictional nor foundational issue that is integral to the resolution of the questions presented in this petition, we do not decide whether the scope of Child’s waiver extended to the constitutionality of Section 32A-2-20. See State v. Javier M., 2001-NMSC-030, ¶ 10, 131 N.M. 1, 33 P.3d 1 (holding that this Court may reach “a foundational issue which is integral to a complete and thorough analysis of the specific question presented in the petition for writ of certiorari”); see also Rule 12-502(C)(2)(b) NMRA (“[T]he Court will consider only the questions set forth in the petition....”). Therefore, we reject the State’s invitation to reverse the Court of Appeals on jurisdictional grounds and proceed to the significant constitutional issue presented in Child’s certiorari petition. Classification of Juvenile Offenders {17} The State argues that the Court of Appeals should not have overruled Gonzales because Apprendi does not apply to amenability proceedings for youthful offenders. Before we begin our analysis, we briefly describe New Mexico’s three-tiered juvenile offender classification. {18} The Delinquency Act establishes three levels of juvenile offenders, largely based on the alleged offense leading to the filing of a petition against the child. At the upper extreme are serious youthful offenders, children between the ages of fifteen and eighteen who are charged with first-degree murder. See NMSA 1978, § 32A-2-3(H) (1993) (amended 2009). Serious youthful offenders are automatically tried and, if convicted, sentenced as adults. Id. (citing State v. Muniz, 2003-NMSC-021, ¶ 21, 134 N.M. 152, 74 P.3d 86). At the other end of the spectrum are delinquent offenders, children of any age up to eighteen who have committed other less serious acts “that would be designated as a crime under the law if committed by an adult.” Section 32A-2-3(A). Delinquent offenders are tried in the children’s court and, if adjudicated, can receive a maximum disposition of commitment to a juvenile facility until their twenty-first birthday. See NMSA 1978, § 32A-2-19(B)(l)(c) (1993) (amended 2009). {19} The intermediate classification of juvenile offender, the youthful offender, has required our repeated attention and is the one relevant to this case. See, e.g., State v. Jones, 2010-NMSC-012, 148 N.M. 1, 229 P.3d 474. Youthful offenders are children between the ages of fourteen and eighteen who (1) are adjudicated for any of a list of felonies, enumerated by statute, which have consequences less serious than first-degree murder, including the offenses to which Child pleaded guilty in this case, or (2) have three prior, separate felony adjudications within the three years preceding the offense. See § 32A-2-3(J). Youthful offenders also include fourteen-year-old children adjudicated for first-degree murder. See id. When a child is an alleged youthful offender, the State may seek an adult sentence by giving notice of its intent to do so within ten days of filing the initial petition. See § 32A-2-20(A). The child is then tried in children’s court, but according to the Rules of Criminal Procedure for the District Courts. See Rule 10-101(A)(2)(b) NMRA. If the child is adjudicated for the alleged offense, the children’s court must hold an amenability hearing pursuant to Section 32A-2-20(B)(l), to determine whether it has the discretion to sentence the child as an adult. The Apprendi Line of Cases Through Cunningham {20} Turning to the matter at hand, we begin with an overview of the history of the Apprendi rule. In Apprendi, the Supreme Court invalidated New Jersey’s “hate crime” law, which the trial judge relied on to extend the defendant’s sentence after finding by a preponderance of the evidence that the defendant’s various weapons-related offenses had been “motivated by racial bias.” Apprendi, 530 U.S. at 470-71, 120 S.Ct. 2348 (internal quotation marks and citation omitted). In striking down the “hate crime” law, the Supreme Court articulated a bright-line rule, predicated on the Sixth Amendment right to a trial by jury as applied to the states through the Fourteenth Amendment. Id. at 525, 120 S.Ct. 2348. “Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” Id. at 490, 120 S.Ct. 2348. As Justice O’Con-nor predicted in her dissent, the so-called Apprendi rule has had a pivotal impact on criminal sentencing procedures across the nation. See id. at 524, 120 S.Ct. 2348 (O’Connor, J., dissenting) (characterizing the majority’s ruling as a “watershed change in constitutional law”). {21} The trend coming out of the Supreme Court’s post-Apprendi decisions was unmistakable. See Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007) (invalidating California’s guidelines); United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (invalidating the federal sentencing guidelines); Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (invalidating Washington’s sentencing scheme); Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (invalidating Arizona’s death penalty sentencing scheme); Apprendi, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (invalidating New Jersey’s sentencing scheme); see also United States v. O’Brien, — U.S.-, -, 130 S.Ct. 2169, 2182, 176 L.Ed.2d 979 (2010) (holding that the judge’s finding — that the weapon used in a drug trafficking crime was a machine gun — violated Apprendi because it increased the defendant’s mandatory sentence from five to thirty years). The result in each of these eases was the same. The Court applied the bright-line Apprendi rule and declared each sentencing scheme unconstitutional because a judge, not a jury, made a factual determination that increased a criminal penalty beyond the statutory maximum that otherwise would have applied without that determination. But see Booker, 543 U.S. at 249-50, 125 S.Ct. 738 (remedying the constitutional defect of the federal sentencing guidelines by excising the provision requiring their mandatory application). {22} The Court did not flinch or deviate from the binary, black-or-white Apprendi analysis. If anything, the Court strengthened the Apprendi rule when, in response to the State of Washington’s defense of its sentencing scheme,[2] it clarified that the “statutory maximum” beyond which a judge, as opposed to a jury, may not increase a sentence is “the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.” Blakely, 542 U.S. at 303, 124 S.Ct. 2531. The Court intended its rule to apply literally, regardless of what some warned as “the collateral, widespread harm to the criminal justice system and the corrections process, ... resulting from the Court’s wooden, unyielding insistence on expanding the Apprendi doctrine far beyond its necessary boundaries.” Cunningham, 549 U.S. at 295, 127 S.Ct. 856 (Kennedy, J., dissenting). {23} More than once this Court has wrestled with the Apprendi rule, most recently in State v. Frawley, 2007-NMSC-057, 143 N.M. 7, 172 P.3d 144, where we were compelled to apply the Supreme Court’s approach to criminal sentencing to our own statutory framework. In Frawley, 2007-NMSC-057, ¶ 22, 143 N.M. 7, 172 P.3d 144, we overruled an opinion that we had issued less than two years earlier, State v. Lopez, 2005-NMSC-036, 138 N.M. 521, 123 P.3d 754, and held unconstitutional a provision of the Criminal Sentencing Act which allowed a trial judge to increase a defendant’s basic sentence by up to one-third upon a finding of certain aggravating circumstances. See NMSA 1978, § 31-18-15.1 (1979) (amended 2009). The result in Frawley was, as a practical matter, dictated by the Supreme Court’s decision in Cunningham, 549 U.S. at 274, 127 S.Ct. 856, which held that a similar sentencing scheme ran afoul of the Apprendi rule. Frawley, 2007-NMSC-057, ¶ 22, 143 N.M. 7, 172 P.3d 144 (“We have no choice but to conclude that Frawley’s sentence was altered upwards in contravention of the Sixth Amendment. ...”). Our opinion in Frawley remains good law today, and nothing said in this Opinion should be taken as undermining either its holding or rationale. {24} If the Supreme Court had stopped at Cunningham, we would be hard-pressed to disagree with our Court of Appeals that judge-made amenability determinations under Section 32A-2-20 violate the Apprendi rule. If we were to assume — as did the Court of Appeals — that the amenability determination falls within the scope of the Apprendi rule, then the Court of Appeals’ conclusion would appear correct. After all, Section 32A-2-20(B) and (C) does permit a trial judge to increase a youthful offender’s sentence far beyond the juvenile disposition that would otherwise apply, based on findings not made by a jury or admitted by the child relating to non-amenability to treatment or rehabilitation as a juvenile. See Blakely, 542 U.S. at 303, 124 S.Ct. 2531 (defining “statutory maximum” as the maximum sentence that “a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant”). According to Blakely, that “should be the end of the matter.” Id. at 313, 124 S.Ct. 2531. As we explain below, however, we reach a contrary result because we take a different view of the Supreme Court’s most recent opinion in Ice. Based on Ice, we conclude that the Apprendi rule, and the Sixth Amendment on which it stands, was never designed to reach collateral decisions like amenability to treatment or rehabilitation that are not tied to the offenses charges. Oregon v. Ice Defines the Outer Limit of the Apprendi Rule {25} In 2009, the Supreme Court finally marked the outer limit of the Apprendi rule in Ice, 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517, and in so doing reframed our analysis. In Ice, a jury found the defendant guilty of two counts of first-degree burglary and four counts of first-degree sexual assault, stemming from two occasions in which he broke into an apartment and sexually assaulted an eleven-year-old girl. 555 U.S. at -, 129 S.Ct. at 715. Oregon’s sentencing statute generally requires a trial judge to impose concurrent sentences, limiting the defendant’s prison exposure in Ice to a maximum of 90 months. But at sentencing the trial judge found that the two burglaries and two sets of sexual assault “constituted ‘separate incident[s],’ ” triggering the judge’s statutory discretion to impose consecutive sentences. Id. at -, 129 S.Ct. at 715-16 (citation omitted). Exercising that discretion, the judge imposed a 340-month sentence from which the defendant appealed. He argued that the sentencing statute violated the Apprendi rule because it permitted a trial judge to increase a sentence based on the finding of a fact not submitted to a jury and not proven beyond a reasonable doubt. Id. at-, 129 S.Ct. at 716. The Oregon Supreme Court agreed with the defendant that the concurrent sentencing statute violated Apprendi. Ice, 555 U.S. at -, 129 S.Ct. at 716. {26} The U.S. Supreme Court reversed, holding that the Apprendi rule simply does not apply. The majority held that the concurrent sentencing statute is beyond “the scope of the Sixth Amendment’s jury-trial guarantee, as construed in Apprendi.” Ice, 555 U.S. at-, 129 S.Ct. at 714 (emphasis added). In other words, whether Oregon’s statute leads to an increase in sentence without a jury finding — the Apprendi rule — is irrelevant; the statute does not implicate the constitutional concerns which the rule was meant to address. See Ice, 555 U.S. at -, 129 S.Ct. at 718. {27} The Court made clear that it viewed the sentencing statute in Ice as fundamentally different from those that it had considered in the previous cases applying the Apprendi rule. According to the 5-4 majority, the Apprendi rule had only been applied to sentencing in the “offense-specific context,” Ice, 555 U.S. at-, 129 S.Ct. at 714, whereas the defendant in Ice was seeking to expand the rule beyond the facts of his offense to consecutive-sentencing findings for “multiple offenses different in character or committed at different times.” Id. at-, 129 S.Ct. at 717. Because of this difference, the central question for the Court was whether to “extend” the Apprendi rule to a new area of criminal sentencing law — concurrent or consecutive sentencing — in which the jury traditionally had played no role. See Ice, 555 U.S. at-, 129 S.Ct. at 717. {28} To determine whether to extend Apprendi to the realm of consecutive sentencing, the Court looked to the “twin considerations” of “historical practice and respect for state sovereignty.” Ice, 555 U.S. at -, 129 S.Ct. at 717. The Court’s historical inquiry focused on “whether the finding of a particular fact was understood as within ‘the domain of the jury ... by those who framed the Bill of Rights.’” Id. (quoting Harris v. United States, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion)). The Court noted that, historically, the judge had controlled the decision to impose sentences consecutively or concurrently; traditionally the jury had played no role. Id. Further, the “prevailing practice” historically had been to impose consecutive sentences; concurrent sentences were the exception. Therefore, Oregon’s statutory presumption in favor of concurrent sentences, subject to a finding by the judge, did not impinge upon the traditional role of the jury. There is no encroachment here by the judge upon facts historically found by the jury, nor any threat to the jury’s domain as a bulwark at trial between the State and the accused. Instead, the defendant — who historically may have faced consecutive sentences by default — has been granted by some modern legislatures statutory protections meant to temper the harshness of the historical practice. Id. at-, 129 S.Ct. at 718. For the same reasons, the Court held that the statute did not create an “entitlement” to have the concurrent sentencing findings made by a jury. Rather, “the scope of the constitutional jury right must be informed by the historical role of the jury at common law” — leaving legislatures free to make policy choices unfettered by the Apprendi rule insofar as they pertain to areas outside the historical role of the jury. Ice, 555 U.S. at -, 129 S.Ct. at 718. {29} Also counseling against extending the Apprendi rule to consecutive-sentencing determinations are principles of federalism, or state sovereignty, which include “the authority of States over the administration of their criminal justice systems.” Ice, 555 U.S. at -, 129 S.Ct. at 718. The Court expressed concern over “straitjaeketing” the States from pursuing the “‘salutary objectives’ of promoting sentences proportionate to ‘the gravity of the offense.’ ” Id. at -, 129 S.Ct. at 719 (quoting Blakely, 542 U.S. at 308, 124 S.Ct. 2531). Similarly, the Court made a slippery-slope argument that the application of Apprendi to consecutive sentencing could extend to other sentencing determinations that judges make, other than the length of incarceration, such as findings relating to the length of supervised release following a prison sentence, terms of community service, and imposing fines or restitution. Ice, 555 U.S. at -, 129 S.Ct. at 719. “Intruding Apprendi’s rule into these decisions on sentencing choices or accoutrements surely would cut the rule loose from its moorings.” Ice, 555 U.S. at -, 129 S.Ct. at 719. Finally, the Court voiced reluctance to burden states with the added administrative difficulties that adhere to the criminal process when juries are involved beyond Apprendi’s core concern of safeguarding the traditional role of the jury. Ice, 555 U.S. at-, 129 S.Ct. at 719. {30} Perhaps most revealing of new limits for the Apprendi rule, Justice Scalia’s dissent voiced frustration that the majority opinion “is a virtual copy of the dissents” in each of the prior cases applying the Apprendi rule. Ice, 555 U.S. at -, 129 S.Ct. at 720 (Scalia, J., dissenting). His dissent repeatedly emphasizes that the historical and sovereignty-based arguments relied on by the majority are “the same (the very same) arguments” rejected in Apprendi. Ice, 555 U.S. at -, 129 S.Ct. at 721. Justice Scalia is not wrong in his assessment. {31} Ice signals change. The Ice majority opinion appears to embrace, for the first time, the point of view taken in the dissenting opinions in the Apprendi line of cases. The opinion does appear to represent a pivotal turning point in the Court’s Sixth Amendment analysis, signaling a demarcation of how far at least a majority of the Court will extend Apprendi’s black-or-white rule. After all, the trial judge in Ice did enlarge the defendant’s sentence well beyond the statutory maximum based upon a factual determination made by the judge and not the jury. And yet, the Court looked beyond just the obvious, arithmetic impact on sentencing to explore the historical roots — and the limits— of the Apprendi rule. {32} Though we have struggled before in our efforts to divine how the Supreme Court would apply its rule, see Lopez, 2005-NMSC-036, 138 N.M. 521, 123 P.3d 754, we take Ice at face value and the majority at its word. The majority made clear that it will not “‘expand[] the Apprendi doctrine far beyond its necessary boundaries.’” Ice, 555 U.S. at -, 129 S.Ct. at 719 (quoting Cunningham, 549 U.S. at 295, 127 S.Ct. 856 (Kennedy, J., dissenting)). Our principal difference with the Court of Appeals distills to this one Supreme Court opinion. We think the Court of Appeals placed too little emphasis on Ice in reaching its conclusion. {33} After Ice, the Apprendi rule continues to apply with full force to judicial findings enlarging criminal sentences that conflict with the traditional domain of the jury. Where a defendant seeks to “extend” the Apprendi rule, however, beyond the context of the sentencing statutes in the Apprendi line of cases, this Court will engage in a more probing analysis taking into account the historical role of the jury and the effect on principles of federalism. The findings required by Section 32A-2-20(B) are beyond the scope of the Apprendi rule. {34} We now turn to the substantive issue before us, which is whether the findings required by Section 32A-2-20(B) are unconstitutional because they deprive youthful offenders of a Sixth Amendment right to have a jury make those findings, as that right is defined in Apprendi and limited by Ice. We begin, as the Supreme Court did in Ice, and as our Court of Appeals did in Gonzales, with our view that Child’s proposal to apply Apprendi to Section 32A-2-20(B) would extend the Apprendi rule beyond the context in which it arose and previously has been applied. We agree with the State that the findings required by Section 32A-2-20(B), like the findings in Ice, are not offense-specific. At its core, Section 32A-2-20(B) mandates a careful balancing of individual and societal interests involving a delinquent child’s prospects for reintegration into public life by the time the child turns twenty-one. Importantly, the focus of the findings at issue is on the child, not on the particular offense committed. See § 32A-2-20(B) (providing that to sentence a youthful offender as an adult, the judge must find that “(1) the child is not amenable to treatment or rehabilitation as a child in available facilities; and (2)the child is not eligible for commitment to an institution for children with developmental disabilities or mental disorders” (emphasis added)). {35} Admittedly, the particular circumstances of the child’s offense may have some bearing on this decision. For example, some of the factors that the judge must weigh under Section 32A-2-20(C) are “offense specific,” such as (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether a firearm was used to commit the alleged offense; [and] (4) whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted. However, the judge must also consider a range of other information relating to the child that has little or nothing to do with the charged offenses. See § 32A-2-20(C)(5), (7) (providing that the trial judge shall consider “the maturity of the child as determined by consideration of the child’s home, environmental situation, social and emotional health, pattern of living, brain development, trauma history and disability” and “the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available”). {36} Regardless of the particular offense of which a youthful offender is adjudicated— or, as this case demonstrates, even the number of offenses — the inquiry under Section 32A-2-20(B) is the same: Can the child be rehabilitated or treated sufficiently to protect society’s interests by the time he reaches the age of twenty-one? Questions of rehabilitation and societal protection are exactly what dominated the thinking of the trial judge in this very case. The inquiry is neither offense-specific nor, as we shall see, is it a task traditionally performed by juries. Nonetheless, though we hold that the context and purpose of the findings required under Section 32A-2-20(B) insulate them from the Apprendi rule, we think it prudent to submit the offense-specific factors in Section 32A-2-20(C)(2), (3) and (4) to the jury during the trial perhaps by way of special interrogatories. Doing so will place only a minimal burden on the process because it can be done during the trial. We refer this matter to the UJI Committee for Criminal Cases for appropriate action. Factors Leading to an Ice Analysis {37} We are also persuaded, as was the U.S. Court of Appeals for the Tenth Circuit in Gonzales v. Tafoya, 515 F.3d 1097 (10th Cir.2008), that the predictive nature of the findings required by Section 32A-2-20 set them apart from the findings considered in the Apprendi cases. See Gonzales, 515 F.3d at 1114 (holding on habeas review that the findings required by Section 32A-2-20 do not violate the Apprendi rule). As Tenth Circuit Chief Judge Henry noted in Gonzales, the Supreme Court has generally applied the Apprendi rule to retrospective findings, because such findings are more susceptible to a decision by the jury beyond a reasonable doubt. Gonzales, 515 F.3d at 1113. By contrast, the not-amenable-to-treatment and not-eligible-for-eommitment findings at issue here are forward-looking determinations, which necessarily involve a level of uncertainty and informed judgment — as opposed to historical fact-finding — that is not typically submitted to a jury. Cf. Addington v. Texas, 441 U.S. 418, 429, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (“Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous”). {38} As our courts have seen first-hand, an informed amenability determination can be made only by weighing a thorough knowledge of the resources for treatment and rehabilitation offered by the State against various, and often conflicting, psychological and social evaluations of “the child’s home, environmental situation, social and emotional health, pattern of living, brain development, trauma history and disability.” Section 32A-2-20(C)(5). Like the civil commitment findings in Addington, the fallibility and lack of precision inherent in the amenability determination “render certainties virtually beyond reach in most situations.” 441 U.S. at 430, 99 S.Ct. 1804. Indeed, both our Court of Appeals and the Tenth Circuit relied on this distinction when they rejected Apprendibased challenges to Section 32A-2-20. See Gonzales, 2001-NMCA-025, ¶¶ 47-48, 130 N.M. 341, 24 P.3d 776; Gonzales, 515 F.3d at 1114. Although the historical/predictive distinction was not relevant in Ice, we find it meaningful here. {39} Additionally, the findings in the Apprendi line of cases uniformly occurred in the adult criminal context, whereas, the findings required by Section 32A-2-20(B) arise in the juvenile justice context. See Gonzales, 515 F.3d at 1111 (noting that “Apprendi did not involve judicial findings that a juvenile should be prosecuted as an adult”). The Supreme Court has traditionally given states wider latitude in adopting particular trial and sentencing procedures for juveniles — including whether to have a jury trial at all. See McKeiver v. Pennsylvania, 403 U.S. 528, 550, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (holding that the right to a jury trial does not apply to juvenile proceedings). Given that Ice expressly instructs us to consider principles of federalism and state sovereignty in determining whether to apply Apprendi, we find this distinction particularly significant. {40} We are persuaded that applying the Apprendi rule here — to findings that are not offense-specific, are predictive in nature, and are made in the juvenile context — represents an extension of the circumstances under which the rule has previously been applied. We will therefore look to the “twin considerations” of “historical practice and respect for state sovereignty” to determine whether the Sixth Amendment jury-trial guarantee extends to the findings required by Section 32A-2-20. Ice, 555 U.S. at -, 129 S.Ct. at 717. The Jury Historically Played No Role in Sentencing a Child as an Adult {41} As an initial matter, Child and Amici both argue that, although the Sixth Amendment right to a jury trial does not apply to juvenile proceedings under McKeiver, New Mexico, nonetheless, confers such a right as a matter of law “when the offense alleged would be triable by jury if committed by an adult.” NMSA 1978, § 32A-2-16(A) (2009). Apprendi’s Sixth Amendment protections, the argument goes, extend to alleged youthful offenders who are, by definition, charged with an offense that would be triable by a jury if committed by an adult. See § 32A-2-3(J) (defining “youthful offender” and listing youthful offender offenses). For the sake of argument, we can concede the point. See Rudy B., 2009-NMCA-104, ¶ 65, 147 N.M. 45, 216 P.3d 810 (Sutin, J., specially concurring) (noting that youthful offenders are treated as adults who are protected under the Sixth Amendment). However, that is only the beginning of our inquiry. To determine whether Apprendi applies, Ice teaches that we must look to “whether the finding of a particular fact was understood as within ‘the domain of the jury ... by those who framed the Bill of Rights.’ ” 555 U.S. at -, 129 S.Ct. at 717 (quoting Harris, 536 U.S. at 557, 122 S.Ct. 2406). {42} We agree with the Court of Appeals that the historical analysis undertaken in Ice would be a poor fit here if the inquiry were limited to whether the post-trial amenability determination required by Section 32A-2-20(B) was within the purview of the jury at the time of the framing of the Bill of Rights. See Rudy B., 2009-NMCA-104, ¶ 23, 147 N.M. 45, 216 P.3d 810. As we shall discuss, our post-trial amenability proceeding for youthful offenders (as opposed to a pretrial waiver determination) is unique among the several states and did not exist until 1993 when the Legislature enacted its most recent version .of our Children’s Code. See id.; see also Jones, 2010-NMSC-012, ¶ 31, 148 N.M. 1, 229 P.3d 474 (citing Daniel M. Vannella, Note, Let the Jury Do the Waive: How Apprendi v. New Jersey Applies to Juvenile Transfer Proceedings, 48 Wm. & Mary L.Rev. 723, 753 (2006)). However, Ice’s focus is on the historical origins of the findings themselves and not on whether those findings occur before or after trial. Therefore, our historical analysis is not limited to the precise setting in which our children’s court judges currently make the amenability determination. {43} Although the timing of our amenability proceeding is unique, the specific inquiry of whether a child is amenable to treatment or rehabilitation is hardly exclusive to New Mexico. Since Cook County, Illinois established the first juvenile court in 1899, all 50 states have enacted some form of juvenile code that emphasizes treatment and rehabilitation, as opposed to punishment, for juvenile offenders. However, the juvenile codes also allow for adult treatment when the child is determined to be incapable of reform. See Samuel M. Davis, Rights of Juveniles 2d: The Juvenile Justice System § 1:1, at 1-2 (2d ed.2010). Unlike New Mexico’s current, post-adjudicatory proceeding, the overwhelming majority of states considers the amenability question at the initiation of proceedings against the child at a transfer or “waiver” hearing. See Davis, supra § 4:1, at 212 (explaining that New Mexico is currently one of only five states that do not “provide by statute for waiver of jurisdiction or a functional equivalent”). {44} The focus of the pre-trial waiver proceeding followed in other states is similar to our post-trial amenability hearing. The judge must determine whether to waive the jurisdiction of the juvenile court in favor of the adult trial court based on the child’s amenability to treatment or rehabilitation. Prior to 1993, New Mexico made the amenability determination in a pre-trial waiver proceeding. See 1955 N.M. Laws, ch. 205, § 9 (requiring the trial judge to make a finding that the child was not a “proper subject for reformation or rehabilitation” prior to initiating adult proceedings); NMSA 1953, § 13-14-27(A)(2) (Vol. 3, Repl., Part 1); 1975 N.M. Laws, ch. 320, § 4(A)(5). Thus, while New Mexico now makes the amenability determination post-trial, the inquiry is largely the same as that of a pre-trial waiver proceeding: whether the child should be subjected to adult consequences based on the lack of prospects for successful treatment and rehabilitation. {45} Of the courts to consider whether judge-made, pre-trial waiver determinations violate the right to a jury trial, “the overwhelming weight of authority ... concludes that Apprendi does not apply to juvenile waiver hearings.” State v. Kalmakoff, 122 P.3d 224, 227 n. 29 (Alaska Ct.App.2005) (citing 15 decisions from other jurisdictions holding that the findings made in waiver proceedings do not violate Apprendi)', see also Gonzales, 515 F.3d at 1116 (same); Vannella, supra, at 751 (noting that most of the courts considering whether Apprendi applies to waiver proceedings have held that it does not). But see Commonwealth v. Quincy Q., 434 Mass. 859, 753 N.E.2d 781, 789 (2001) (holding that Apprendi requires the prosecution to present sufficient evidence to the grand jury that the child’s conduct “involved the infliction or threat of serious bodily harm” to indict a juvenile as a youthful offender), overruled on other grounds by Commonwealth v. King, 445 Mass. 217, 834 N.E.2d 1175, 1201 n. 28 (2005). None of those cases, however, occurred recently enough to apply lee and, therefore, we do not place great reliance upon them here. {46} Interestingly, the factors that the New Mexico judge must consider under Section 32A-2-20(C) to determine whether to invoke an adult sentence are used in other jurisdictions to determine whether waiver is appropriate. 2 Wayne R. LaFave, Substantive Criminal Law § 9.6(d), at 69-70 (2d ed.2003). These factors are largely identical to a set of criteria laid out by the U.S. Supreme Court in Kent v. United States, 383 U.S. 541, 566-67, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). The Court offered these factors as considerations that the trial judge should weigh in making the waiver decision to ensure procedural fairness and due process in juvenile waiver proceedings.[3] Significantly, of the 45 states that have pre-trial waiver hearings, all of them allow the judge “to transfer juveniles to adult court after making specified findings.” Gonzales, 515 F.3d at 1116 (citing Vannella, supra, at 739). {47} Similarly, since the inception of the first New Mexico Juvenile Code in 1917, our statutes and caselaw make clear that it is the trial judge, not the jury, who decides whether to invoke an adult sentence based on a child’s amenability to treatment — whether pre- or post-adjudication. Since 1955, the trial judge has been expressly required by statute to decide whether a child is amenable to treatment or rehabilitation based upon certain findings. See 1955 N.M. Laws, ch. 205, § 9 (requiring the trial judge to make a finding that the child was not a “proper subject for reformation or rehabilitation” pri- or to initiating adult proceedings); § 13-14-27(A)(2); 1975 N.M. Laws, eh. 320, § 4(A)(5); § 32A-2-20(B). Before 1955, the trial judge had the discretion to try and sentence a juvenile as an adult. As this Court explained in State v. Doyal, 59 N.M. 454, 286 P.2d 306 (1955), the judge made that decision by weighing the same interests presently required by Section 32A-2-20. [M]ay we not fairly assume that in whatever capacity as judge he acts [whether as a judge of the district court or the juvenile court], he will so exercise his discretion as to try no child in the district court for what would have been a felony if done by an adult, if extreme youth of the offender plus other facts in evidence gives reasonable promise of his rehabilitation by treatment in the juvenile court; nor at all save where the demands of society for the prevention and punishment of crime are so compelling as to leave no other alternative. .... Never, since our legislature enacted the first Juvenile Delinquency Act, has it attempted to deny district courts their traditional and constitutional power to place on trial one accused of having committed a felony, merely because his age at the time of the offense placed him below the maximum named in the statute for juvenile delinquents. Doyal, 59 N.M. at 461-62, 286 P.2d at 311-12. {48} Doyal establishes that, since the inception of separate proceedings for juveniles in 1917, the trial judge — -not the jury — was responsible for determining whether to try and sentence a child as an adult based on the child’s amenability to treatment or rehabilitation. Put simply, the trial judge has decided the child’s amenability to treatment or rehabilitation for as long as that determination has been a part of criminal proceedings in New Mexico. {49} Child argues in the present ease that the rebuttable presumption for children between the ages of seven and fourteen, also known as the common-law infancy defense, provides the appropriate historical analog to the modern-day amenability determination. The infancy defense required the prosecution to prove that when a child subject to the rebuttable presumption committed the alleged offense, the child “manifested a consciousness of guilt, and a discretion to discern between good and evil.” 4 William Blackstone, Commentaries on the Laws of England 23-24 (1769); see 2 LaFave, supra § 9.6(a), at 62-63. The State had to prove the child’s criminal capacity to the jury beyond a reasonable doubt. See Commonwealth v. Mead, 92 Mass. 398, 399 (1865) (“[T]he question whether, in committing an offence, such child in fact acted with intelligence and capacity, and an understanding of the unlawful character of the act charged, is to be determined by the jury upon the evidence, and in view of all the circumstances attending the alleged criminal transaction.”). Child argues that the finding of infancy and the finding of amenability are essentially the same and, therefore, because the jury historically decided whether the infancy defense was applicable, Apprendi should apply. {50} We are not persuaded. The infancy defense, which acted as a complete bar to criminal liability, was a rebuttable presumption that a child of a certain age could not form the necessary criminal intent to commit the crime of which he was accused. In other words, a child who raised the infancy defense effectively argued that, although he committed the act necessary to constitute the charged offense, he should be relieved from liability because he did not understand the moral consequences of his actions — he was not culpable. Infancy is, thus, a determination of historical fact closely linked to mens rea, one of the essential elements of most crimes and historically determined by the jury. {51} By contrast, the amenability finding does not exonerate the child or render him blameless. As with any criminal proceeding, the jury may find at the adjudicatory stage that a juvenile lacked the requisite mens rea to be guilty of the charged offense. See Addington, 441 U.S. at 428, 99 S.Ct. 1804 (recognizing that In re Winship, 397 U.S. 358, 367, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the U.S. Supreme Court held that the state must prove “[the juvenile’s act and intent] beyond a reasonable doubt” (emphasis added)). Rather, the amenability determination is predictive and focuses on the child’s prospective capacity for treatment or rehabilitation. This difference persuades us that the jury’s traditional determination of infancy is not helpful to our resolution. {52} Even more to the point, the amenability determination only applies to youthful offenders, who by definition must be at least fourteen years of age, see § 32A-2-3(J); whereas, the common-law infancy defense only applied to children between the ages of seven and fourteen. The jury, therefore, played no historical role in determining whether a child over the age of fourteen had the capacity to commit a crime, because at common law such children “had the same capacity as adults” and were commonly treated as such. 2 LaFave, supra § 9.6(a), at 62-63. Clearly, we can conclude that the amenability determination is not an “encroachment ... by the judge upon facts historically found by the jury, nor any threat to the jury’s domain as a bulwark at trial between the State and the accused.” Ice, 555 U.S. at -, 129 S.Ct. at 718. Rather, like the concurrent sentencing statute in Ice, the amenability inquiry is a statutory protection granted to juveniles by our Legislature “to temper the harshness of the historical practice,” id., which often led to older children being incarcerated next to hardened criminals. See In re Gault, 387 U.S. 1, 15, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (“The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals.”). {53} Neither Child nor the State offer any other historical basis for us to determine whether Apprendis rule is applicable to the amenability determination, and we can find none. Thus, although the amenability determination was not an aspect of the prosecution of juveniles at the time of the framing of the Bill of Rights, it has been a question for the judge — not the jury — since the creation of the juvenile court systems at the turn of the twentieth century. Put simply, an amenability determination has never been based upon facts “historically found by the jury,” and so it cannot be a “threat to the jury’s domain” as preserved in the U.S. Constitution. We now turn to the second of Ice’s “twin considerations,” state sovereignty and principles of federalism. Principles of federalism preclude the application of Apprendi to the amenability finding. {54} As Ice explained, “[w]e have long recognized the role of the States as laboratories for devising solutions to difficult legal problems.” 555 U.S. at -, 129 S.Ct. at 718-19 (citing New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandéis, J., dissenting)). Ice further acknowledged the states’ traditional sovereign authority over “the administration of their criminal justice system.” 555 U.S. at -, 129 S.Ct. at 718. The realm of juvenile procedures and sentencing is particularly within the states’ area of exclusive control. When considering whether the Sixth Amendment’s right to a jury trial extends to juvenile proceedings, the Supreme Court held, “We are reluctant to disallow the States to experiment further and to seek in new and different ways the elusive answers to the problems of the young....” McKeiver, 403 U.S. at 547, 91 S.Ct. 1976. {55} To be sure, the Supreme Court has made clear that juvenile proceedings must meet minimal constitutional requirements. Kent set the minimum procedural requirements for waiver proceedings, 383 U.S. at 566-67, 86 S.Ct. 1045; In re Gault extended to juveniles the right to notice of charges, to counsel, to confrontation and to cross-examination of witnesses, and to the privilege against self-incrimination, 387 U.S. at 33-34, 41, 55-56, 87 S.Ct. 1428; In re Winship gave juveniles the protection of the reasonable doubt standard, 397 U.S. at 367, 90 S.Ct. 1068. {56} At the same time, the Court has repeatedly emphasized that it follows a more deferential approach to state decisions of how to administer their juvenile court systems. “From the inception of the juvenile court system, wide differences have been tolerated — indeed insisted upon — between the procedural rights accorded to adults and those of juveniles.” In re Gault, 387 U.S. at 14, 87 S.Ct. 1428. The amenability determination, being an essential step in the adjudication and disposition of children, is but one example of the independence traditionally afforded to states in this area. As such, our amenability determination is entitled to a level of deference based on traditional principles of federalism and state sovereignty. See Ice, 555 U.S. at -, 129 S.Ct. at 719 (“This Court should not diminish that role [of states as laboratories] absent impelling reason to do so.”). {57} Given the states’ discretion “to experiment further and to seek in new and different ways the elusive answers to the problems of the young,” McKeiver, 403 U.S. at 547, 91 S.Ct. 1976, it would strike us as inconsistent if Apprendi or the Sixth Amendment were to mandate a jury finding beyond a reasonable doubt that a child is not amenable to treatment or eligible for commitment. We have little doubt that states have the authority, however ill-advised it may be, to do away with the amenability determination altogether and to prosecute and sentence juveniles as adults. For example, New Mexico is one of 29 states that has enacted “legislative waiver” statutes which automatically subject juveniles charged with certain defined crimes to adult proceedings and sentences without the exercise of any judicial discretion. See Vannella, supra, at 741 (providing that a juvenile between the ages of 15 or 18 who is “charged with and indicted or bound over for trial for first-degree murder” — a so-called “serious youthful offender” — is not entitled to the protections of the Delinquency Act, citing Section 32A-2-3(H)). If our Legislature can deny the right to juvenile procedures and dispositions wholesale without offending the Constitution, then the Legislature ought to be able to extend greater protection to children — and establish a procedure for doing so — without running afoul of the Constitution. See Ice, 555 U.S. at -, 129 S.Ct. at 719 (“To hem in States by holding that they may not equally choose to make concurrent sentences the rule, and consecutive sentences the exception, would make scant sense.”). This is especially time when the jury has never played a role in making this determination. {58} Finally, the same administrative burdens noted by the Supreme Court in Ice counsel against applying Apprendi to amenability determinations. See Ice, 555 U.S. at -, 129 S.Ct. at 719. If Apprendi were to apply to a finding that has never been made by the jury, it seems difficult to limit its reach with respect to the other sentencing determinations that New Mexico allows its judges to make other than the length of incarceration. Applying Apprendi to a post-trial amenability determination would require bifurcated proceedings with attendant delay and added cost — a burden we are reluctant to impose absent a clear directive from the Constitution. {59} In sum, because the amenability determination historically has not been made by the jury, applying Apprendi would interfere unnecessarily with New Mexico’s traditional discretion in administering a system of juvenile justice. We hold that the amenability determination is not within the scope of the Apprendi rule and the Sixth Amendment’s guarantee of a jury trial does not apply to amenability proceedings. CONCLUSION {60} We reverse the Court of Appeals’ determination that Section 32A-2-20 is facially unconstitutional and remand to the Court of Appeals for consideration of Child’s remaining appellate arguments that (1) there was insufficient evidence to support the findings necessary to sentence him as an adult, and (2) his separate convictions for shooting from a motor vehicle resulting in great bodily harm and aggravated battery with a deadly weapon violate constitutional protections against double jeopardy. {61} IT IS SO ORDERED. WE CONCUR: CHARLES W. DANIELS, Chief Justice, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices. EDWARD L. CHÁVEZ, Justice (dissenting). . Section 32A-2-20 provides, in relevant part, C. In making the findings set forth in Subsection B of this section, the judge shall consider the following factors: (1) the seriousness of the alleged offense; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether a firearm was used to commit the alleged offense; (4) whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted; (5) the maturity of the child as determined by consideration of the child's home, environmental situation, social and emotional health, pattern of living, brain development, trauma history and disability; (6) the record and previous history of the child; (7) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available; and (8) any other relevant factor, provided that factor is stated on the record. . The sentencing statute in Blakely set the "standard range” for second-degree kidnaping at 49-53 months but allowed a trial judge to sentence a defendant up to ten years based on a finding of "substantial and compelling reasons justifying an exceptional sentence.” Blakely, 542 U.S. at 299, 325-26, 124 S.Ct. 2531 (internal quotation marks and citation omitted). .The criteria in Kent, 383 U.S. at 566-67, 86 S.Ct. 1045, provides as follows: 1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver. 2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner. 3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted. 4. The prosecutive merit of the complaint, i.e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney). 5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U.S. District Court for the District of Columbia. 6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living. 7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions. 8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.