**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date:   **March 9, 2018**

**NO. A-1-CA-35528**

**STATE OF NEW MEXICO,**

   Plaintiff-Appellant,

v.

**NEHEMIAH G.,**

   Child-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**John J. Romero, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John J. Woykovsky, Assistant Attorney General
Albuquerque, NM

for Appellant

Bennett J. Baur, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellee

**OPINION**

**FRENCH, Judge.**

{1}     During the night of January 18-19, 2013, when he was fifteen years old, Defendant Nehemiah G. (Child) killed his father, mother, and three younger siblings. He was indicted on five counts of first-degree murder and three counts of intentional child abuse resulting in the death of a child under age twelve. In October 2015, Child pleaded guilty to two counts of second-degree murder and, as charged, three counts of intentional child abuse resulting in death. Pursuant to NMSA 1978, Section 32A-2-20 (2009), the district court conducted an amenability hearing over the course of seven days in January and February 2016. At the conclusion of the hearing, the court found that "the State failed to prove by clear and convincing evidence that [Child] is not amenable to treatment or rehabilitation as a child in available facilities," and accordingly committed him to the custody of the New Mexico Children, Youth and Families Department (CYFD) until his twenty-first birthday (occurring March 20, 2018). The State has appealed the amenability determination. Because we determine that the district court abused its discretion by (1) insufficiently considering and failing to make proper findings regarding each of the seven statutory factors upon which the amenability determination rests, (2) misinterpreting precedent to conclude that the first four statutory factors related to the commission of the crime were of lesser or no

applicability to that ultimate determination, and (3) arbitrarily disregarding uncontradicted expert testimony that indicated Child would not be rehabilitated by his twenty-first birthday, we reverse and vacate the district court's amenability determination, and remand for rehearing.

**BACKGROUND**

{2} We begin by summarizing the testimony given at the hearing concerning the circumstances of Child's personal life, including his maturity, his situation at home, his social and emotional health, and the facts concerning the commission of the crimes. At the time of the killings, Child lived in a house in Bernalillo County with his parents, Greg G. (Greg) and Sarah G. (Sarah), his nine-year-old brother, Z.G., and his two younger sisters, five-year-old J.G. and two-year-old A.G. The family was involved with and frequently attended church together at Calvary Chapel in Albuquerque, New Mexico. Child met his girlfriend, twelve-year-old A.W., at Calvary Chapel. He played in the church band, and his hobbies included skateboarding and video games, namely a World War II game called "Call of Duty." Child had always been home schooled. His mother taught him, but Child said that his studies had also been largely "self-directed" because his mother was too busy. Child said he planned to get a GED and to join the military when he turned eighteen. He

claimed that he had used marijuana every few weeks since he was about twelve years old, which he got from his friends at church.

{3} Child described his mother as generally quiet, but she yelled at him at home. He said that she was always upset with him and his siblings, constantly angry or depressed, and she rarely smiled. Child said that she was verbally abusive to him nearly every day and had told him that she regretted his birth and wished she could stone him to death. Child also said that when she was especially mad, about once each month, she hit the children with a belt.

{4} Child's father, Greg, grew up Catholic but later became involved with gangs. He renewed his faith after spending time in jail, became a Christian pastor, and held a ministry at the Metropolitan Detention Center in Albuquerque, New Mexico. Greg purportedly told Child that before re-converting to Christianity and while he was part of a gang, he was in and out of jail a few times and had last been arrested for a drive-by shooting. Greg worked at Calvary Chapel for a period of time, but lost his job there in 2012. The family had financial difficulties, and Greg began working the night shift at the Rescue Mission. Child said that he and his father occasionally shot guns together. Greg was worried about intruders attacking the family when he worked the night shift, so he kept guns at the house for purposes of protecting the family and gave Child orders to stay up and patrol the property at night. Greg was hard on Child

3

and Child recalled that when he was twelve years old he lost consciousness after being in a fight with his father.

{5} The morning of January 18, 2013, Child communicated to his girlfriend his thoughts about committing the crimes and said that he wanted to see her despite his parents preventing him from doing so. Sarah yelled at Child frequently that day and he felt irritated. He said he played "Call of Duty" for a couple of hours in the late afternoon, but he spent from 5:00 p.m. to 10:00 p.m. in his mother's room with her. Child said that around 11:50 that evening, he had become increasingly angry and he decided that he would proceed with a plan to kill his mother, who by then had fallen asleep with Z.G. in her bedroom. Child retrieved a gun from the closet in her bedroom and shot her in the head two times. Child said that he shot her from about fifteen feet away and that he expected to kill her when he shot. Z.G. went to get tissues to clean up his mother's blood. When Z.G. returned, Child said to him "you're next" and shot Z.G. once in the head. Child claimed that he never liked Z.G. and that Z.G. had once threatened to kill him. Child then proceeded down the hall to find his sisters, who were crying, and shot both of them. Child said that he was certain they were dead after he shot them. Child recalled thinking that his father was a larger person and that he would need a more powerful gun to kill his father when he returned home from working a night shift. He retrieved his father's AR-15 rifle, shot his sister's lifeless

4

body once more to see how loud the gun sounded, and went downstairs to wait for his father to return. Child waited in the bathroom for several hours until he heard his father walk by the door. When his father arrived, Child stepped out and shot him four times in the back, then walked closer to his father's body and shot him in the head.

{6} Both before and after the killings, between 11:20 p.m. on January 18, 2013 and 9:20 p.m. on January 19, 2013, Child and his girlfriend, A.W., exchanged text messages regarding a plan to kill their respective parents. Child also texted A.W. a picture of his mother and brother after he killed them, and much later, after having waited several hours for his father to return before killing him, Child told A.W. that he had killed him, too. They then arranged to meet at Calvary Chapel.

{7} Child was arrested on January 20, 2013. As stated, he was indicted on five counts of first-degree murder and three counts of intentional child abuse resulting in the death of a child under twelve years of age. Nearly three years later, Child pleaded guilty to two counts of second-degree murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), for the deaths of his mother and father, and three counts of intentional child abuse resulting in the death of a child under twelve years of age, contrary to NMSA 1978, Section 30-6-1(D) (2009), for the deaths of his brother and two sisters. The district court subsequently found that the State had failed to establish that Child was not amenable to treatment or rehabilitation, and entered a judgment committing

5

Child "to the custody of [CYFD] to be confined until he reaches the age of twenty-one (21) unless sooner discharged." Child was nineteen years old at the time of disposition, and therefore his juvenile sanction amounted to confinement for a duration of approximately two years. The State appeals from the amenability finding which allowed the imposition of juvenile sanctions rather than an adult sentence.

**DISCUSSION**

{8} This appeal presents two issues: (1) Does the State have the right to appeal the amenability finding, and (2) Did the district court abuse its discretion in making that finding? We conclude that the State has the right to appeal from the amenability order, and that the district court abused its discretion by making the amenability finding.

**A. The State Has a Statutory Right to Appeal**

{9} As an initial matter we address whether this Court has jurisdiction over the State's appeal from the determination of the district court on Child's amenability to treatment in juvenile facilities. The State argues that it has both a statutory and constitutional right to appeal under NMSA 1978, Section 32A-1-17 (1999), NMSA 1978, Section 39-3-2 (1966), and Article VI, Section 2 of the New Mexico Constitution.

6

{10}     We first examine the State's statutory arguments. Section 32A-1-17(A) of the Children's Code, NMSA 1978, §§ 32A-1-1 to -25-5 (1993, as amended through 2015), provides that "[a]ny party may appeal from a judgment of the court to the court of appeals in the manner provided by law." Neither party disputes that the district court's ruling resulted in a final judgment for purposes of appeal, and we agree that the judgment is final because all issues of law and fact have been determined and the case has been disposed of by the district court to the fullest extent possible. *See Zuni Indian Tribe v. McKinley Cty. Bd. of Cty. Comm'rs*, 2013-NMCA-041, ¶ 16, 300 P.3d 133. There is also no question that the State is a party to the case, so whether the State has a right to appeal turns on whether its appeal is "in the manner provided by law." Section 32A-1-17(A).

{11}     The State argues that Section 32A-1-17(A) itself creates a right to appeal, and that it appealed "in the manner provided by law" because it followed Rule 12-201 NMRA, Rule 12-202 NMRA and Rule 12-208 NMRA. Our previous cases, however, have not interpreted Section 32A-1-17 as creating a right to appeal from Children's Code proceedings, and have instead interpreted it as requiring us to look to other statutes or to the New Mexico Constitution to determine whether an appeal is authorized. For example, in *In re Doe*, 1973-NMCA-141, 85 N.M. 691, 516 P.2d 201, we considered the predecessor statute to Section 32A-1-17, which also provided that

7

appeals could be taken "in the matter provided by law[,]" and concluded that it required us to determine whether the appeal in that case was "authorized by law." *In re Doe*, 1973-NMCA-141, ¶ 3. We then held that another statute authorized the appeal. *Id.* ¶¶ 4-5. Both we and our Supreme Court have reached similar conclusions in other cases. *See State v. Jade G.*, 2007-NMSC-010, ¶¶ 1, 9-14, 141 N.M. 284, 154 P.3d 659 (allowing appeal by the state from a suppression order in a Children's Code case under NMSA 1978, Section 39-3-3(B)(2) (1972))*; In re Christobal V.*, 2002-NMCA-077, ¶¶ 1, 8, 132 N.M. 474, 50 P.3d 569 (holding that the State had the right to appeal from a delinquency proceeding because it was an "aggrieved party" under Article VI, Section 2 of the New Mexico Constitution). Accordingly, we hold that Section 32A-1-17 does not create a right to appeal. A right to appeal, if it exists, must be based on some other statute, or on the state constitution.

{12} The State also argues that delinquency proceedings are considered civil rather than criminal proceedings and, therefore, it may appeal from the children's court's order under Section 39-3-2. Section 39-3-2 governs civil appeals from district court, and provides that any party aggrieved may appeal "from the entry of any final judgment or decision, any interlocutory order or decision which practically disposes of the merits of the action, or any final order after entry of judgment which affects substantial rights[.]"

{13} The State cites no case which applies Section 39-3-2 to a juvenile delinquency proceeding, and we are not aware of any that do. Although we have applied NMSA 1978, Section 39-3-4 (1999), the statute authorizing interlocutory appeals from civil and special statutory proceedings, to delinquency proceedings, we did so because delinquency proceedings are special statutory proceedings, not on the ground that they are civil proceedings. *See In re Doe*, 1973-NMCA-141, ¶¶ 3-5 (holding that the predecessor statute to Section 39-3-4 authorized interlocutory appeal from juvenile proceeding that was itself statutorily authorized by the Delinquency Act). Our holding in *In re Doe* is consistent with a long line of opinions from our Supreme Court describing juvenile delinquency proceedings as special statutory proceedings (which are also known as "special proceedings"). *Cf. State v. Florez*, 1931-NMSC-068, ¶ 4, 36 N.M. 80, 8 P.2d 786 (recognizing that a proceeding sentencing minors who pleaded guilty to larceny was a statutory and special proceeding); *In re Santillanes*, 1943-NMSC-011, ¶ 20, 47 N.M. 140, 138 P.2d 503 ("That the juvenile delinquency act deals with special cases and sets up special proceedings, we do not doubt."); *State v. Acuna*, 1967-NMSC-090, ¶ 9, 78 N.M. 119, 428 P.2d 658 (acknowledging holding of *Florez* that juvenile proceedings are 'special statutory proceedings' as opposed to criminal proceedings) (citation omitted); *State v. Jones*, 2010-NMSC-012, ¶ 13, 148 N.M. 1, 229 P.3d 474 (stating that an amenability hearing is a "special proceeding").

{14} Because proceedings under the Children's Code are special statutory proceedings, we hold that the State has a right to appeal under NMSA 1978, Section 39-3-7 (1966), which provides that any aggrieved party may appeal "the entry of any final judgment or decision, . . . or any final order after entry of judgment which affects substantial rights, in any special statutory proceeding in the district court[.]" *See also* NMSA 1978, § 32A-1-5 (1993) (establishing the children's court as a division of the district court). Though neither party discussed the applicability of Section 39-3-7 to this case, their failure to bring it to our attention does not bar us from considering it, because the issue involves this Court's appellate jurisdiction. *See State v. Morris*, 1961-NMSC-120, ¶ 2, 69 N.M. 89, 364 P.2d 348 ("The fact that the jurisdictional question is not raised by the parties is of no consequence."); *William K. Warren Found. v. Barnes*, 1960-NMSC-069, ¶¶ 7-8, 67 N.M. 187, 354 P.2d 126 (noting that jurisdiction cannot be conferred by the parties through waiver or consent).

{15} Having concluded that Section 39-3-7 is the appropriate statute to apply to the present case, we must determine whether the State is an "aggrieved" party. See § 39-3-7 (stating that "any party aggrieved may appeal" from a final judgment in a special statutory proceeding in district court). "An 'aggrieved party' means a party whose interests are adversely affected." *Christobal V.*, 2002-NMCA-077, ¶ 8 (citation

omitted). "The [s]tate is aggrieved by a disposition contrary to law[.]" *Id.; cf. State v. Aguilar*, 1981-NMSC-027, ¶¶ 5-7, 95 N.M. 578, 624 P.2d 520 (agreeing that the state was an "aggrieved party" "where it alleges a disposition contrary to law in a criminal proceeding" and also noting that the state has a "strong interest in the enforcement of its statutes"). As set forth more fully below, we find that the district court's disposition of this case was "contrary to law" because it failed to make the findings required under Section 32A-2-20(C), misinterpreted our Supreme Court's precedent, and its decision to arbitrarily disregard unanimous expert testimony "adversely affected" the State's "strong interest in the enforcement of its statutes." *Aguilar*, 1981-NMSC-027, ¶¶ 5-7; *Christobal V.*, 2002-NMCA-077, ¶ 8. Accordingly, we conclude that the State has a right to appeal the district court's amenability determination under Section 39-3-7.

{16} Having held that the State has a right to appeal because this proceeding is a special statutory proceeding, we need not discuss the State's argument that it has a constitutional right to appeal. *See Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so." (internal quotation marks omitted)).

11

## B.    Abuse of Discretion

{17}    We turn to the substance of the State's appeal, whether the district court abused its discretion in finding that the State had failed to prove that Child was not amenable to treatment. We begin by discussing the Delinquency Act, NMSA 1978, §§ 32A-2-1 to -33 (1993, as amended through 2016), with some specificity, because our analysis hinges on the district court's application of the Act's provisions to the testimony taken during Child's amenability hearing. We then review in detail the testimony presented at the amenability hearing and the district court's decision. Finally, we explain our conclusion that the district court abused its discretion.

### 1.    Governing Law

{18}    Section 32A-2-3(C), (H), and (J) of the Delinquency Act, establishes three classes of juvenile offenders, the last two of which are relevant to Child: delinquent offenders, serious youthful offenders, and youthful offenders. *see State v. Gonzales*, 2001-NMCA-025, ¶ 16, 130 N.M. 341, 24 P.3d 776 (explaining that "the Legislature created three 'classes' of juvenile offenders: serious youthful offenders, youthful offenders, and delinquent offenders"), *overruled on other grounds by State v. Rudy B.*, 2009-NMCA-104, 147 N.M. 45, 216 P.3d 810. The categories have important consequences because a child's placement in one of them determines the potential post-adjudication consequences that the child will face. *Jones*, 2010-NMSC-

012, ¶ 10. This categorization "reflect[s] the rehabilitative purpose of the Delinquency Act, coupled with the realization that some juvenile offenders cannot be rehabilitated given the limited resources and jurisdiction of the juvenile justice system." *Gonzales*, 2001-NMCA-025, ¶ 16. Serious youthful offenders, children fifteen to eighteen years old charged with committing first-degree murder, "are excluded from the jurisdiction of the children's court unless found guilty of a lesser offense." *Id*; Section 32A-2-3(H). Serious youthful offenders are, therefore, tried and sentenced as adults in district court. *See* § 32A-2-6(A); *Jones*, 2010-NMSC-012, ¶ 11 ("Once charged with first-degree murder, a serious youthful offender is no longer a juvenile within the meaning of the Delinquency Act, and therefore is no longer entitled to its protections. As a result, serious youthful offenders are . . . automatically sentenced as adults if convicted.") (citation omitted); *see also Gonzales*, 2001-NMCA-025, ¶ 16 (explaining that "the Legislature has determined that serious youthful offenders cannot be rehabilitated using existing resources in the time available" given "the age of these offenders and the seriousness of the offense, including the requisite intent").

{19}    Based on the indictment, Child was initially classified as a serious youthful offender, and therefore if convicted would have been automatically subject to adult sentencing. However, because Child pleaded guilty to second-degree murder and

13

intentional child abuse resulting in the death of a child under twelve years of age, he is classified as a youthful offender. Youthful offenders are children fourteen to eighteen years old who are adjudicated guilty of at least one of twelve enumerated felonies, including second-degree murder as provided in Section 30-2-1 and child abuse resulting in death as provided in Section 30-6-1. *See* § 32A-2-3(J)(1)(a), (m). Youthful offenders "potentially face either juvenile or adult sanctions, depending on the outcome of a special proceeding after adjudication known as an amenability hearing." *Jones*, 2010-NMSC-012, ¶ 13.

{20} At the amenability hearing, the parties may present evidence regarding, and the district court "shall consider" the following factors:

(1) the seriousness of the offense;

(2) whether the . . . offense was committed in an aggressive, violent, premeditated or willful manner;

(3) whether a firearm was used to commit the . . . offense;

(4) whether the . . . offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted;

(5) the maturity of the child as determined by consideration of the child's home, environmental situation, social and emotional health, pattern of living, brain development, trauma history, and disability;

(6) the record and previous history of the child;

14

(7)     the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services, and facilities currently available; and

(8)     any other relevant factor, provided that factor is stated on the record.

Section 32A-2-20(C).

{21}    To "consider[,]" the court must "think about this evidence with a degree of care and caution." *State v. Doe*, 1979-NMCA-122, ¶ 13, 93 N.M. 481, 601 P.2d 451. Further, our Supreme Court has held that the district court also must make "findings" regarding each of the factors. *See State v. Sosa*, 1997-NMSC-032, ¶ 8, 123 N.M. 564, 943 P.2d 1017. Based on its consideration of and findings regarding these factors, *see id.*, the court in its discretion, *see* § 32A-2-20(A), may impose an adult sentence only if it makes the following findings:

(1)     the child is not amenable to treatment or rehabilitation as a child in available facilities; and

(2)     the child is not eligible for commitment to an institution for children with developmental disabilities or mental disorders.

Section 32A-2-20(B). If the court does not make these findings, then it must impose juvenile sanctions.

{22}    The Delinquency Act reflects the unique status of children who commit delinquent acts and our Legislature's hesitation to impose punitive measures that potentially leave children incarcerated as adults. *See* § 32A-2-2 (listing the purposes

of the Delinquency Act, including "to remove from children committing delinquent acts the adult consequences of criminal behavior"); *see also Jones*, 2010-NMSC-012, ¶ 32 (interpreting the legislative history of the Delinquency Act "as evidence of an evolving concern that children be treated as children so long as they can benefit from . . . treatment and rehabilitation"). Through the provisions of the Delinquency Act, "the Legislature no longer allows a child to be sentenced as an adult without the court first finding that the child is not amenable to treatment." *Id.* ¶ 33. Non-criminal treatment is the rule and adult criminal treatment the exception because "unlike the adult criminal justice system, with its focus on punishment and deterrence, the juvenile justice system reflects a policy favoring the rehabilitation and treatment of children." *Id*. ¶ 35 (internal quotation marks and citation omitted). Juvenile justice rests on the understanding that some youthful offenders are not "irredeemably depraved." *Graham v. Florida*, 560 U.S. 48, 72-73 (2010), *as modified* (July 6, 2010); *see id.* (deciding that a juvenile offender forever will be a danger to society would require making a judgment that he is incorrigible, but incorrigibility is inconsistent with youth.). This goal is to be pursued as long as it is "consistent with the protection of the public interest." Section 32A-2-2(A).

{23} The standard of proof for the two amenability findings articulated in Section 32A-2-20(B) reflects these policies and objectives underpinning juvenile justice. The

16

standard is clear and convincing evidence, "a heightened standard of proof" just short of the highest standard, beyond a reasonable doubt. *Gonzales*, 2001-NMCA-025, ¶ 62. "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Michelle B.*, 2001-NMCA-071, ¶ 12, 130 N.M. 781, 32 P.3d 790 (internal quotation marks and citation omitted). Despite the fact that the amenability determination is fraught with uncertainties and predictions, *see State v. Rudy B.*, 2010-NMSC-045, ¶ 38, 149 N.M. 22, 243 P.3d 726 ("[T]he fallibility and lack of precision inherent in the amenability determination render certainties virtually beyond reach in most situations."(internal quotation marks and citation omitted)), this Court has been wary of "[a]bandoning the goal of rehabilitation" too easily "through the mechanism of a too-low standard of proof." *Gonzales*, 2001-NMCA-025, ¶ 62.

{24}     The Delinquency Act and the factors required by the amenability determination present evidentiary hurdles for the State as described above, but also impose challenges for the district court. CYFD and the district court lose authority to retain in custody a youthful offender sentenced as a juvenile beyond his or her twenty-first birthday. *See* § 32A-2-19(B)(1)(c); *Rudy B.*, 2010-NMSC-045, ¶ 18; *State v. Ira*, 2002-NMCA-037, ¶ 27, 132 N.M. 8, 43 P.3d 359. Section 32A-2-20(B) thus requires

17

the district court to carefully balance the individual and societal interests at stake and to determine whether the delinquent child can be reintegrated into public life by the time he or she turns twenty-one. Indeed, the court's limited jurisdiction over children sentenced as juveniles can be "simply inadequate when the juvenile offender is extremely dangerous and in need of intensive treatment that, if there is any hope of rehabilitation, must extend well beyond the time that our current statutory scheme gives our courts to rehabilitate juvenile offenders." *Ira*, 2002-NMCA-037, ¶ 25; *see also Sosa*, 1997-NMSC-032, ¶ 10 (noting that "the brief period of treatment available to [the defendant] was insufficient to accomplish rehabilitation and protection of the public").

{25} The district court can be placed in a classic dilemma: impose juvenile sanctions, in which case the child will be released upon turning twenty-one years of age although rehabilitation and treatment may be incomplete and although the child may pose some risk to society; or impose an adult sentence, which may result in lengthy incarceration depriving the youthful offender of decades of freedom, but which eliminates the risk to society with certainty. *Ira*, 2002-NMSC-037, ¶ 47 (Bosson, J., specially concurring); *see id.* (describing the difficulty as a Hobson's choice that leaves the court with "essentially . . . no choice but to protect society at the expense of the child"). If the judge sentences the youthful offender as a juvenile,

18

the offender "go[es] free at age twenty-one, regardless of whether or not he proved to be truly amenable to rehabilitation." *Id.*

**2.     The Amenability Hearing**

{26}     Child's amenability hearing spanned seven days. The State and Child called numerous witnesses to testify, including some who knew the family from their attendance at Calvary Chapel, some who worked with Child during his stay at Sequoyah Adolescent Treatment Center, and others qualified as experts who testified specifically about Child's amenability to treatment by the age of twenty-one.

{27}     Dr. Neel Madan, a clinical radiologist and neuroradiologist who reviewed scans of Child's brain, discussed the likelihood that the images revealed traumatic brain injury. Dr. Madan could not come to a conclusion about whether Child was malnourished or suffered a traumatic brain injury. He testified the images revealed no signs of bruising, scarring, or micro hemorrhaging in the brain. Dr. William Orrison, Child's neuroradiologist, testified that Child's brain scan evaluations returned findings that were abnormal and consistent with trauma. Dr. Orrison answered affirmatively when asked if Child's brain would be fully developed by his mid-twenties if he received the proper treatment and education.

{28}     Detectives from the Bernalillo County Sheriff's Office testified about their involvement with the investigation of the crimes. One discussed the photos that Child

had taken of his deceased family members, which Child kept on his iPod. Another interviewed Child during the investigation the day after the crimes, describing him as a responsive, average teenager. Child was calm, he changed his story once, cried when he discussed his mother, and was cooperative. Child told the detective that he was tired because he had not gotten any sleep the night before. Another detective described the discovery of the bodies in the house. There was also testimony about the discovery of the guns, which Child had put in Greg's car after the killings, and the ammunition found around the house. Dr. Clarissa Krinsky, who helped perform the autopsies on the five bodies, noted, among other things, that Sarah was likely shot from a distance of not more than one to two feet, that Z.G.'s gunshot wound was "rapidly fatal," and that Greg's injuries were consistent with those caused by a high power rifle.

{29} The district court next heard testimony about Child's presence at church from members who interacted with Child and his family. One witness described the family as "very disciplined" and "very respectful." He said Child did not often initiate conversation but was engaged when spoken to, and that he had never seen Child bully or pick fights with anyone. Vince Harrison, the safety director at Calvary Chapel, said that Greg was a "typical father" who was always with his family.

20

{30} The district court then heard testimony from employees and therapists at Sequoyah Adolescent Treatment Center, where Child had resided since May 2014. Rick Morrison performed Child's initial screening upon his entry into the facility. Morrison explained that Child's academic performance had improved, that Child had to work really hard, and that he would occasionally become frustrated with spelling and writing. His progress was normal and he learned at the "appropriate pace." Another employee said Child had days when he was sad and crying. This employee stated that on one occasion Child nearly got into a fight, but he has since been working on his coping skills. He further testified that Child shows "a lot of respect" for the employees, he does what is asked of him without complaining, and he is "a role model." A teacher at Sequoyah said Child has a strong interest in history, specifically Roman history and World War II. He described Child's progress in the classroom, noting that "he's more willing to hear opinions that he doesn't necessarily agree with and at least consider them." However, the teacher expressed concern that Child is "looking for a key to power," and remains fascinated by people with absolute power and control.

{31} Cheryl Aiken, Child's therapist at Sequoyah, also testified about his behavior at the facility. She said Child had problems with tolerance and racism and issues with people that he perceived to be different from him, and that he learned it from his

parents, whom he said were prejudiced. Child has, however, learned and uses coping skills to manage his emotions, which she said is part of handling the trauma Child underwent given the alleged physical aggression and abuse by his father and mother. When asked to assess Child's progress, Aiken said he has "done very well" after twenty months of treatment at Sequoyah, and the medications he was taking for depression and hallucinations were helpful. Aiken said that Child has been in treatment and "he's made progress, so that . . . in itself shows that he's treatable." She described Child as "treatable" because he has made progress academically and has not been involved in any altercations, and explained that he has been able to manage his emotions. She said he is polite, has worked through his emotional issues, talked about and takes responsibility for what happened, and is, therefore, treatable. The average stay at the facility is between four and six months, but Aiken noted that Child has been there for twenty months because "he still needs treatment." When asked about the safety and risks associated with Child, Aiken stated: "I don't think we've talked about him stopping treatment right now . . . [he] certainly needs more work and hopefully that's addressed."

{32} Several experts testified specifically about Child's amenability to treatment by the time he reaches the age of twenty-one. Dr. Mohandie, called by the State, said that Child could not be treated by the time he reached the age of twenty-one. After stating

22

that treating Child would "take a long time," Dr. Mohandie was asked whether it was possible or realistic to expect to treat Child in the two years remaining before his twenty-first birthday, to which he plainly replied: "No."

{33}     Child called Dr. Manlove, who testified, "I can't say how he's going to be doing in two years[.]" To the extent Dr. Manlove expressed that Child was generally amenable to treatment, he did not say that Child would be treated or otherwise rehabilitated by age twenty-one, the time of his release from custody. Dr. Manlove, when asked specifically, "Is [Child] amenable to treatment?" replied, "He's definitely amenable to treatment from my perspective." However, Dr. Manlove emphasized that he "really strongly believe[d] that the trajectory should be extended as long as possible." On cross-examination, Dr. Manlove said that "we'd have a good feel for how he was doing by the time he was somewhere in his mid-20s range," and that he should be reassessed then.

{34}     Dr. Fields, whom the district court appointed and Child called to testify stated, "Even though, statistically, his chances of reoffending in a violent way are very small, it's still partly based upon what he did, which . . . was absolutely horrific." He said, "I recommended a minimum of five years, and the reason I picked that was that [at] the end of five years, he would be twenty-three years old and brain development is completed by then." Dr. Fields based his recommendation partly on the development

23

of Child' brain and its faculties and partly on "the work" that he believed Child needed to do. "It is just a start and there is more to be done and I don't think it can be finished by the time he is twenty-one." Dr. Fields repeated his conclusion that the risk to the public, if Child remained in a structured treatment program for a while, would be very low. As long as Child "stays under the thumb of the court" when he transitions into the community, Child "will not pose a threat to the community." Dr. Fields also concluded that Child should not "be sentenced as a juvenile, do something for two and a half years, and cut him loose the day he turns twenty-one. That doesn't seem appropriate to me."

{35} Dr. Fields repeated his recommendation later on, recommending that Child be treated for "a minimum period of five additional years." He and defense counsel discussed the development of a child's frontal lobes, which are not fully formed until the age of twenty-three or the age of twenty-six. Dr. Fields was indeterminate about the exact age at which the frontal lobes are fully formed: "I wouldn't be surprised that in some cases it would take longer and in some cases it would probably take shorter" because "there's nothing magic about a particular age." Dr. Fields repeated, "there's no measure that you can do now and say . . . [Child] will have fully formed executive functioning and fully formed frontal lobes at the age of twenty-one and a half or the age of twenty-four[.]" He said Child needed to be reassessed at age twenty-three by

24

treatment professionals and probation officers. Counsel then asked Dr. Fields: "This fully developed [frontal lobe issue,] . . . it wavers by person. It can happen earlier than [age] twenty-three. Do you have any belief that would happen?" Dr. Fields replied, "I would seriously doubt that anything under five years would suffice to produce the kinds of changes that I think [Child] needs to undergo before being deemed appropriate to release from court supervision[.]" He continued, "I'm not talking about frontal lobes now, I'm just talking about. . . *if we just look at what he did* and what are, at least as I delineated them and as I see them, the psychological makeup he has and problems he has, I just don't see that sooner than that is going to suffice to produce the kinds of changes that I think need to happen."

{36}     Finally, the court heard testimony from Dr. George Davis, a psychiatrist employed by CYFD and called by Child. Dr. Davis did not testify about whether Child would be rehabilitated by the age of twenty-one. He testified about Youth Diagnostic Center's (YDC) capacity to address Child's needs, concluding that it could in fact meet his needs. He was asked if there is anything YDC could do to help Child when he reaches the age of twenty-one to ensure he reintegrated into society appropriately. Dr. Davis discussed the availability of the support offered, including discharge planners, a medical planner who arranges psychiatric and other similar appointments depending on the offender's needs, and transition coordinators who are

involved in other aspects of reintegration, such as employment and education opportunities. Dr. Davis described the cut-off at age twenty-one as "not ideal because . . . it's just like a drop off," which is why YDC makes an effort to have delinquent offenders enter a reintegration center with enough time to set up community contacts for the offender, participate in school programs, and find employment.

**3.      The Amenability Decision**

{37}      After all the witnesses had testified, the district court over the course of nearly two hours orally summarized—but did not make findings about—most of the testimony. The court did not summarize the detectives' testimony, commenting instead that it "focused quite frankly on the crime . . . I'm not going over that testimony."

{38}      The district court then read aloud Sections 32A-2-20(B)(1) and (2). Observing that there had been no evidence presented regarding the Section 32A-2-20(B)(2) finding, that Child was eligible for commitment to an institution for children with developmental disabilities or mental disorders, the court stated that it "finds accordingly" but noted that the question under Section 32A-2-20(B)(1) remained: whether "the child is not amenable to treatment or rehabilitation as a child in available facilities[.]"

26

{39} The district court then stated that "the focus of the hearings has been on all the [Section 32A-2-20(C)] factors," but specifically identified the fifth, sixth and seventh factors. It stressed that an amenability hearing is an evidentiary hearing to determine if the child is *not* amenable to treatment, and observed that the burden is on the State to make that showing by clear and convincing evidence. Citing *Rudy B.*, and while acknowledging that "you can't really focus on the child without talking about the offenses committed," the district court stated that our New Mexico Supreme Court, reminds us that "the focus of amenability hearings and the focus of the findings is on the child, not on the particular offense committed." The district court continued:

> The overriding question is can [Child] be rehabilitated or treated sufficiently to protect society's interest by the time he reaches the age of twenty-one? The Supreme Court again reminds us that the inquiry is not offense-specific. . . . Based on the evidence that I've summarized, the testimony specifically from Dr. Manlove, to a lesser degree, to a greater degree the testimony from Dr. Fields, and from Dr. Davis along with the testimony of those who have worked very closely with [Child] at least since May of 2014 are that he is amenable to treatment. . . . The question is, and . . . the elephant in the room [is], what happens when he turns twenty-one? To quote Ms. Pato, "we don't know." We do know that Dr. Fields has waffled on his magic age [of] twenty-three by saying there is no magic age, has also stated that for some youth that development occurs earlier and for some youth it occurs later. Dr. Mohandie, by his own admission, his task was to determine whether [Child] was insane. His venturing off into other diagnoses, which his approach and the repudiation of others leaves me with "I don't know" from, I mean, there's no clear and convincing evidence presented that Dr. Mohandie is accurate or inaccurate. In conclusion, the court finds that [Child], based on the testimony presented, has not been found to be not amenable to treatment in available juvenile facilities.

27

{40}     The district court signed an amenability order prepared by Child, stating:

> [T]his court being sufficiently informed, FINDS:
>
>     1.     The State failed to prove by clear and convincing evidence that [Child] is not amenable to treatment or rehabilitation as a child in available facilities, and
>
>     2.     [Child] is not eligible for commitment to an institution for children with developmental disabilities or mental disorders.
>
>     IT IS THEREFORE ORDERED that [Child] will be subject to a juvenile disposition[.]

**4.     Analysis**

{41}     The State argues that the district court abused its discretion by failing to consider and make findings on the first four statutory factors, namely, the seriousness of the offense; whether it was committed in an aggressive, violent, premeditated, or willful manner; whether a firearm was used; and whether it resulted in personal injury. Section 32A-2-20(C)(1)-(4). The State also argues that failing to find Child not amenable to treatment constitutes an abuse of discretion because "the evidence was uncontradicted that [Child] required continued treatment until at least the age of [twenty-three]."

{42}     We review the amenability determination for an abuse of discretion. *Sosa*, 1997-NMSC-032, ¶ 12. This Court "will find an abuse of discretion when the [district] court's decision is clearly against the logic and effect of the facts and

28

circumstances of the case." *Id.* ¶ 7 (internal quotation marks and citation omitted). Additionally, "a trial court abuses its discretion when it exercises its discretion based on a misunderstanding of the law." *State v. Vigil*, 2014-NMCA-096, ¶ 20, 336 P.3d 380.

{43} Based on its discourse at the conclusion of the amenability hearing and the order issued afterwards, we conclude that the district court abused its discretion for three reasons: (1) the district court failed to consider and make findings on all of the statutorily required factors of Section 32A-2-20(C); (2) it based its findings in the amenability order on a misapprehension of the meaning and import of *Rudy B.*; and (3) it misunderstood, and then arbitrarily disregarded, the uncontradicted testimony of the experts who testified specifically about Child's prospects for rehabilitation by the age of twenty-one.

**i.       The District Court Abused its Discretion by Failing to Consider and Make Findings on All of the Statutory Factors of Section 32A-2-20(C).**

{44} The district court summarized the testimony at the end of the amenability hearing. It also acknowledged that several detectives spoke about the circumstances of the crime and the deaths of the family members, and noted the testimony of Dr. Krinsky, the medical examiner whose testimony laid the foundation for introducing various exhibits, including autopsy reports and photographs. The district court expressly refused to consider the testimony of the detectives and the medical

29

examiner, stating that it "focus[ed] quite frankly on the crime" and concluding "I'm not going over that testimony."

{45} The mere recitation of testimony concerning the statutory factors and the explicit refusal to consider testimony concerning the first four factors constitutes an abuse of discretion. Summarizing the evidence is not sufficient. *Cf. Mosley v. Magnolia Petroleum Co.*, 1941-NMSC-028, ¶ 10, 45 N.M. 230, 114 P.2d 740 (canceling a finding of fact that was simply a statement regarding the testimony of witnesses); *State ex rel. Hughes v. City of Albuquerque*, 1991-NMCA-138, ¶¶ 14-16, 113 N.M. 209, 824 P.2d 349 (in light of *Mosley*, examining administrative agency's decision to determine if agency merely recited witness testimony); *Adams v. Bd. of Review of Indus. Comm'n*, 821 P.2d 1, 6 (Utah Ct. App. 1991) (determining that, while tribunal's written decision "contain[ed] an informative summary of the evidence presented, such a rehearsal of contradictory evidence does not constitute findings of fact"; findings of fact must state what "in fact occurred, not merely what the contradictory evidence indicates might have occurred"). It does not equate to making findings, *see Sosa*, 1997-NMSC-032, ¶ 8, or even to considering, i.e., weighing and balancing, the statutory factors. *See Doe*, 1979-NMCA-122, ¶ 13. Importantly, "none of those factors, standing alone, is dispositive. The [district] court *must consider each*

30

*of them . . .* in determining whether the child is amenable to treatment or rehabilitation." *Jones*, 2010-NMSC-012, ¶ 41 (emphasis added).

{46} Furthermore, four of the enumerated factors require consideration of the facts and circumstances surrounding the commission of the crimes, where consideration means "to think about [the] evidence with a degree of care and caution." *Doe*, 1979-NMCA-122, ¶ 13; *see* § 32A-2-20(C)(1)-(4) (requiring consideration of the seriousness of the offense, whether it was committed in an aggressive, violent, premeditated, or willful manner, whether a firearm was used, and whether the offense was committed against persons or property). The district court's refusal to consider, or even review and summarize the testimony about the crimes as it did the testimony concerning the other statutory factors, constitutes an abuse of discretion.

{47} In addition, after reading the factors aloud, the court stated that "the focus of the hearings has been on all of the factors. . . and, *very importantly*," emphasizing the seventh factor, (C)(7) of Section 32A-2-20, "the prospect for adequate protection of the public and the likelihood of reasonable rehabilitation of [Child.]" To the extent that the district court perceived one of the factors to be more important or deserving of greater weight to the exclusion of the first four enumerated factors, it abused its discretion by failing to properly consider each one of them. In *Gonzales*, upon appeal of a district court finding that the defendant was not amenable to treatment and

therefore subject to an adult sentence, the defendant argued that the court had erred by using the seven factors to control, rather than guide, its finding. *See* 2001-NMCA-025, ¶ 45. We held that on the contrary the district court "was required to consider and balance these factors in making its finding[,]" and that "contrary to [the d]efendant's assertion that factor (C)(7) [of Section 32A-2-20] is the only factor relevant to determining a child's amenability to treatment, *we believe that every factor provides important information about the child and the child's prospects for rehabilitation*." *Gonzales*, 2001-NMCA-025, ¶ 45 (emphasis added); *see also Sosa*, 1997-NMSC-032, ¶ 11 (explaining that the district court considered the evidence in support of the defendant's amenability, but determined that it was outweighed by evidence relevant to the other statutory factors that weighed in favor of finding that the defendant was not amenable to treatment).

{48} Our Supreme Court's approach in *Sosa* to the appropriate weighing of each of the Section 32A-2-20(C) factors contrasts with that taken by the district court in this case. In finding the defendant not amenable to treatment, the district court in *Sosa* "[a]s required by statute," weighed all of the factors, including the first four. 1997-NMSC-032, ¶ 10. The court specifically discussed each factor and its effect on the determination: "[t]he serious nature of [the defendant's] offense, which resulted in the death of a young man, weighed in favor of sentencing [the defendant] as an

adult[,] . . . [t]he premeditated and violent nature of the shooting also weighed in favor of sentencing [the defendant] as an adult"; and, "[t]he offense was against a person and resulted in a fatal personal injury, also lending support to an adult sentence." *Id*. Our Supreme Court affirmed the district court's finding of non-amenability "[i]n light of the judge's methodical documentation of his consideration of the evidence as applied to the requisite statutory factors," and concluded that "the district court made a reasoned and justified determination that [the defendant] should be sentenced as an adult." *Id.* ¶ 12; *see id.* (holding that the court must make findings on the seven statutory factors in Section 32A-2-20(C)).

{49} In the absence of any similar documentation, we must review the district court's decision in this case for an abuse of discretion based only on the single-page order finding the State had failed to prove by clear and convincing evidence that Child was not amenable to treatment and on the oral discussion of the testimony at the end of the amenability hearing in which the district court stated that it need not review the testimony concerning the commission of the crimes. While the district court's duty to explain how it weighed and balanced the statutory factors is important in every case, it is especially important in a case like this one, where several statutory factors focus directly on the commission of five "horrific" killings with two firearms, all of which weighed against an amenability determination, and because three experts

33

(discussed more fully below) agreed that Child could not be rehabilitated by the age of twenty-one sufficient to protect the public, which also weighed against an amenability determination. To make a determination that the State had not established that Child was not amenable to treatment, the district court needed to identify the specific evidence, through methodical documentation, that supported its decision and explain how and why that evidence outweighed the numerous factors that supported a finding that Child is not amenable to treatment. Thus, we conclude that the district court abused its discretion by failing to consider and make findings on any of the statutory factors. Next, we turn to the apparent reason the district court did not consider each of the statutory factors.

**ii.     The District Court Based Its Findings in the Amenability Order on a Misapprehension of the Meaning of *Rudy B.***

{50}     In disregarding the first four Section 32A-2-20(C) factors, the district court relied upon *Rudy B.*, which it took to stand for the proposition that an amenability determination focuses on the child, not on the particular offense committed by the child. The district court expressed its understanding of the meaning of *Rudy B.* three times: (1) our New Mexico Supreme Court reminds us that "the focus of the amenability hearings and the focus of the findings is on the child, not on the particular offense committed"; (2) "[our] Supreme Court in *Rudy B.* tells us that the focus of the findings set out in [Section] 32A-2-20 must be on the child, not on the

34

particular offense committed"; and (3) "[our] Supreme Court again reminds us that the inquiry is not offense-specific, and it cautions that the fallibility and lack of precision inherent in the amenability determination renders certainties virtually beyond . . . reach in most situations." Having understood *Rudy B.* to mean that the amenability determination depends on characteristics specific to the offender that do not concern the crime, the district court gave much less weight, if any at all, to the first four statutory factors because they concern the facts surrounding the commission of the crimes.

{51}     The district court misunderstood the meaning of *Rudy B.*, and therefore its applicability to this case, thereby abusing its discretion. *Vigil*, 2014-NMCA-096, ¶ 20; *see id.* ("[A] trial court abuses its discretion when it exercises its discretion based on a misunderstanding of the law."). In *Rudy B.*, the defendant appealed an order finding him not amenable to treatment and sentencing him as an adult, arguing that the Sixth Amendment afforded him the right to have a jury make the findings on the amenability determination. *Rudy B.*, 2010-NMSC-045, ¶ 2. In discussing this issue, our Supreme Court stated that the findings required by Section 32A-2-20(B) "are not offense-specific[,]" and "the focus of the findings at issue is on the *child*, not on the particular offense committed." *Rudy B.*, 2010-NMSC-045, ¶ 34.

35

{52} The court did not, however, pronounce the offense-specific factors of Section 32A-2-20(C) as inferior, or less important, or somehow deserving of lesser weight when determining whether the individual child is amenable to treatment. Immediately following these statements, the court explained that "the particular circumstances of the child's offense may have some bearing on this decision" because "some of the factors that the judge *must weigh* under Section 32A-2-20(C) are offense specific," for example, whether the offense was committed in an aggressive, violent, premeditated, or willful manner. *Rudy B.*, 2010-NMSC-045, ¶ 35 (emphasis added) (internal quotation marks and emphasis omitted).

{53} Moreover, in *Rudy B.*, the court had to examine the nature of the factors provided in Section 32A-2-20(C) and distinguish those relating to the offense from those relating to the character of the offender, because it had to determine whether a judge or a jury is entitled to make the findings required by Section 32A-2-20(B), and typically, juries make factual findings surrounding the particular circumstances of the offense. In other words, the distinction between offense-specific and offender-specific factors was drawn in *Rudy B.*, because it was relevant to the legal question presented—which is unrelated to the question presented in this appeal. That is, it was drawn for purposes of elucidating the nature of the amenability inquiry so as to examine the extent to which it presented tasks that are historically and traditionally

36

reserved for the jury and not the judge. The court did not conclude that the offense-specific factors bear less weight and importance in determining whether or not an offender is in fact amenable to treatment; it concluded only that the offense-specific factors are part of a broader inquiry about the defendant's amenability to treatment, and that larger inquiry is not "a task traditionally performed by juries." *Rudy B.,* 2010-NMSC-045, ¶ 36. Rather than conclude that the offense-specific factors are to be given less weight when determining whether a defendant is amenable to treatment—as the district court here understood it to mean—the court simply suggested that the offense-specific factors be submitted to the jury during trial through special interrogatories. *Id.*

{54} The Delinquency Act creates no rigid delineation between offense-specific and offender-specific factors. It is not possible to evaluate whether the offender is amenable to treatment without evaluating the facts of the crimes that the offender committed, because the offender's conduct in the past is relevant to whether the offender poses a risk of danger to the public. For example, considering whether the offender committed the crimes in a violent, aggressive, or premeditated manner, as required by Section 32A-2-20(C)(2), necessarily entails examination of the offender's persona. The district court itself acknowledged that the distinction is blurred: "you can't really focus on the child without talking about the offenses committed." This

37

Court previously has commented on the inseparability of the factors, explaining that the four factors that focus on the commission of the crime are to be considered insofar as they pertain to the defendant's likelihood of rehabilitation: "The determination of a child's prospects for rehabilitation is a complicated and difficult question that requires consideration of a child's environment, age, maturity, past behavior, and predictions of future behavior as well as *specifics of the offense as they relate to the prospects of rehabilitation*." *See Gonzales*, 2001-NMCA-025, ¶ 26 (emphasis added).

{55} In sum, we conclude that the district court misapprehended the meaning of *Rudy B.*, and therefore failed to consider and make findings on each of the enumerated factors of Section 32A-2-20(C), resulting in an abuse of discretion.

**iii.    The District Court Abused Its Discretion by Disregarding the Unanimous Testimony That Child Would Not Be Rehabilitated by Age Twenty-One.**

{56} Consistent with the general rule, *see State v. Alberico*, 1993-NMSC-047, ¶¶ 36-37, 116 N.M. 156, 861 P.2d 192, a district court conducting an amenability hearing may disregard expert testimony. *See, e.g.*, *Gonzales*, 2001-NMCA-025, ¶ 40 ("We recognize that the fact[-]finder is entitled to disregard evidence presented by either party and to disregard the testimony of experts[.]" (citation omitted)); *see also In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 14, 121 N.M. 562, 915 P.2d 318 ("It is well settled in New Mexico that a fact finder may disregard the opinions of experts.").

{57} Importantly, however, the district court is not free to arbitrarily disregard expert testimony, and instead must have some rational basis for doing so. "[T]he testimony of a witness, whether interested or disinterested, cannot *arbitrarily* be disregarded by the trier of the facts[.]" *Medler v. Henry*, 1940-NMSC-028, ¶ 20, 44 N.M. 275, 101 P.2d 398 (emphasis added); *see id.* (noting that the trier of facts does not arbitrarily disregard witness testimony, even testimony that is not directly contradicted, if the witness is impeached, the testimony is equivocal or improbable, there are suspicious circumstances concerning the transaction testified to, or "legitimate inferences may be drawn from the facts and circumstances of the case that contradict or cast reasonable doubt upon the truth or accuracy of the oral testimony"). *Accord*, *Corley v. Corley*, 1979-NMSC-040, ¶ 6, 92 N.M. 716, 594 P.2d 1172; *Alto Vill. Servs. Corp. v. N.M. Pub. Serv. Comm'n*, 1978-NMSC-085, ¶14, 92 N.M. 323, 587 P.2d 1334; *Estate of Scott v. New*, No. A-1-CA-34566, mem. op. ¶ 4 (N.M. Ct. App. Sept. 17, 2015) (non-precedential) (referring to the '*Medler* rule').

{58} In *Doe*, we applied the "*Medler* rule" in the context of an amenability hearing. *See Doe*, 1979-NMCA-122, ¶ 13. There, the state charged a child whose gun discharged during a deer hunt, killing another person in the hunting party, with murder. *Id*. ¶ 1. Under the predecessor statute to the Delinquency Act, the district court, sitting as the children's court, was authorized to transfer the case to the district

court so that the child could be tried as an adult. *Id*. Before the court could order the transfer, it had to consider, similar to Section 32A-2-20(B), "whether the child is amenable to treatment or rehabilitation as a child through available facilities." *Doe*, 1979-NMCA-122, ¶ 8 (alteration and internal quotation marks omitted); *see also* § 32A-2-20(A)(4). The district court ordered the transfer and the child appealed, arguing that the court abused its discretion in ordering the transfer given that the evidence of his amenability was uncontradicted. *Doe*, 1979-NMCA-122, ¶ 8. This Court observed that the direct evidence that the child was amenable to treatment or rehabilitation—the testimony of his high school principal and a diagnostic evaluation—was uncontradicted, and that no other substantial evidence in the record called amenability into question. *Id.* ¶¶ 9-12. On this basis, and relying on *Medler*, the *Doe* court determined that the district court had abused its discretion in disregarding the uncontradicted evidence of amenability. *Id*. ¶ 13.

{59} *Gonzales* and *In re Ernesto M., Jr.* illustrate application of the same principle in the context of an amenability hearing under current law. In *Gonzales*, the defendant challenged the district court's determination that he was not amenable to treatment as a juvenile, arguing among other grounds that the court ignored uncontradicted expert testimony that he was amenable to treatment. 2001-NMCA-025, ¶ 41. This Court rejected the argument and affirmed, but only after noting the district court's

40

basis for disregarding the expert testimony: the experts' opinions were not unqualified, their opinions were formed without full knowledge of the defendant's history, and while one expert "felt that [the defendant] was amenable to treatment, . . . everything else she said indicated that she really had serious doubts." *Id.* ¶¶ 43-44.

{60} This Court undertook a similar analysis in *In re Ernesto M., Jr.* While again acknowledging that the district court was entitled to disregard the experts' testimony that the defendant was amenable to treatment, we observed that the district court properly might have found the victim's description of the violent crime in question—"that [the c]hild initiated the attack and took pleasure in humiliating and torturing [the v]ictim"—more persuasive than the experts' opinions. 1996-NMCA-039, ¶ 14. In addition, one of the two amenability experts had conceded a lack of certainty about the amenability determination. *Id.* ¶ 15. This evidence supported the district court's decision not to accept the experts' opinions that generally favored amenability and its determination that the defendant should be sentenced as an adult. *Id.*

{61} Here, three expert witnesses—Drs. Mohandie (the State's expert), Manlove (Child's expert) and Fields (the district court's expert)—testified unanimously that Child was not amenable to rehabilitation by age twenty-one. No other direct evidence

41

was presented regarding the subject of amenability by age twenty-one: Dr. Davis did not address the subject, and Ms. Aiken said that he is "treatable" but that he still needs more treatment. She did not state an opinion about his rehabilitation by age twenty-one.

{62}     In its concluding remarks, the district court articulated, as its *sole* ground for disregarding all of the experts' opinions, that Dr. Fields had "waffled": "We do know that Dr. Fields has waffled on his magic age [of] twenty-three by saying there is no magic age, has also stated that for some youth that development occurs earlier[.]" In fact, however, the record reflects that Dr. Fields did not equivocate on his opinion that Child could not be rehabilitated by age twenty-one such that the interests of the public would be protected. Dr. Fields acknowledged that development of the frontal lobe, the part of the brain that controls impulsiveness, may or may not be complete by age twenty-one. But Dr. Fields made clear that the indefinite timing of frontal lobe development did not affect his opinion that Child would not be rehabilitated by age twenty-one. On the contrary, *after* making his comment about the uncertain timing of frontal lobe development, Dr. Fields reiterated his firm belief that, because at least another five years of therapy would be necessary to work through Child's other psychological issues, Child would not be sufficiently treated or rehabilitated by age twenty-one to protect society's interests:

42

I would seriously doubt that anything under five years would suffice to produce the kinds of changes that I think he needs to undergo before being deemed appropriate to release from . . . court supervision, or probation supervision. *Regardless, I'm not talking about frontal lobes now.* I'm just talking about, you know, . . . *if we just look at what he did and . . . the psychological makeup he has and problems he has, . . . I just don't see that sooner than that is going to suffice to produce . . . the kinds of changes that I think need to happen.*

The district court's "waffling" comment thus reflects a basic misunderstanding of Dr. Fields' testimony. A court's exercise of discretion "must be consistent with the evidence." *Schuermann v. Schuermann*, 1980-NMSC-027, ¶ 8, 94 N.M. 81, 607 P.2d 619. Because its articulated basis for disregarding the unanimous expert testimony regarding amenability is unsupported by the record, the district court abused its discretion.

{63}     *State v. Trujillo*, 2009-NMCA-128, 147 N.M. 334, 222 P.3d 1040, stands for the proposition that unanimous expert witness testimony regarding amenability may be rejected if it is outweighed by non-expert evidence bearing on the seven Section 32A-2-20(C) factors. In *Trujillo*, we observed:

This case essentially sets expert opinion against facts and inference drawn by the court from facts surrounding the crime and [the d]efendant's prior criminal history. It is the fact[-]finder's prerogative to weigh the evidence and to judge the credibility of the witnesses. The court was free to disregard expert opinion. It appears to us that the court adequately and appropriately addressed all concerns.

2009-NMCA-128, ¶ 18 (internal quotation marks and citations omitted). *See also Sosa*, 1997-NMSC-032, ¶¶ 10-11 (noting that the district court weighed statutory factors in determining the child should be sentenced as an adult).

{64} Here, however, we simply do not know what, if any, conclusions the district court may or may not have reached regarding any of the evidence other than the expert witnesses' opinions on the question of Child's amenability to treatment and rehabilitation by the time he reaches age twenty-one. While non-expert testimony was presented that in theory might support an inference of amenability, the State vigorously contested the validity and significance of that evidence. The court did not explain what testimony the court found credible or not credible, and did not make any findings or provide other explanation of what material information it gleaned from the testimony that it deemed credible. *See Mosley*, 1941-NMSC-028, ¶ 10; *Adams*, 821 P.2d at 1, 6. Instead, our insight into the court's reasoning is limited to its statement that it would not consider the evidence regarding the first four Section 32A-2-20(C) factors and its misstatement of Dr. Fields' testimony as grounds for disregarding the experts' unanimous view that Child could not be rehabilitated or treated by age twenty-one. We therefore must reverse the district court's amenability determination. "Findings of fact which are not . . . supported [by substantial evidence] cannot be sustained on appeal, and a judgment based on such findings is itself without

44

support." *Vehn v. Bergman*, 1953-NMSC-037, ¶ 22, 57 N.M. 351, 258 P.2d 734; *accord*, *Harrison v. Animas Valley Auto & Truck Repair*, 1987-NMCA-017, ¶ 19, 105 N.M. 425, 733 P.2d 873 ("A judgment cannot be upheld on appeal unless the conclusion upon which it rests finds support in one or more findings of fact".), *rev'd on other grounds*, 1988-NMSC-055, 107 N.M. 373, 758 P.2d 787. We also will not simply affirm on a "right for any reason rationale." *Atherton v. Gopin*, 2015-NMCA-003, ¶ 37, 340 P.3d 630. This Court may not do so where it would require us to "assume the role of the district court and delve into fact-dependent inquiries." *State v. Randy J.*, 2011-NMCA-105, ¶ 28, 150 N.M. 683, 265 P.3d 734.

{65} We emphasize that our role as a reviewing court is limited. "The question for this Court is not what it would . . . [decide] based on the testimony presented below[.]" *Trujillo*, 2009-NMCA-128, ¶ 19. "We do not reweigh the evidence and will not substitute our judgment for that of the [district] court." *Gonzales*, 2001-NMCA-025, ¶ 40. Therefore, we will not undertake an independent review and evaluation of the evidence bearing on the Section 32A-2-20(C) factors. Instead we will remand this matter to the district court to reconsider the evidence and make another amenability determination in accordance with this opinion, including considering and making findings regarding all of the Section 32A-2-20(C) factors.

**5.      Procedural Ramifications on Remand**

{66}      Given the imminent approach of Child's twenty-first birthday (occurring March 20, 2018), we briefly address several issues relating to the consequences of our ruling. First, under the Delinquency Act, when a child reaches age twenty-one, CYFD loses authority to retain him or her in custody. See § 32A-2-19(B)(1), § 32A-2-20(F). Thus, as a practical matter Child could not be returned to CYFD for further treatment and rehabilitation following the district court's completion of another amenability hearing, even assuming the court were to make the same determination as it did in 2016.

{67}      Second, notwithstanding CYFD's loss of authority, on remand the district court will retain jurisdiction over Child during the pendency of the second amenability proceeding, including any appeal. The district court, as children's court, possesses jurisdiction over adults for offenses they committed as juveniles. *See* NMSA 1978, § 32A-1-8(A) (2009) (providing that the children's court has "exclusive original jurisdiction of all proceedings under the Children's Code in which a person is eighteen years of age or older and was a child at the time the alleged act in question was committed"). Further, the State through its district attorney retains continuing jurisdiction to prosecute the case. *See* NMSA 1978, § 32A-1-6(A), (B), (F) (2005).

{68}     Third, as a result of our reversal and remand of the 2016 disposition, Child's status before the district court is as if Child "had not yet been sentenced[.]" *See United States v. Rayford*, 552 Fed. App'x 856, 859 (10th Cir. 2014). That is, he is a youthful offender pending adult sentencing or juvenile disposition. Any determination of detention pending disposition will be made in accordance with Section 32A-2-11, Section 32A-2-12, and Section 32A-2-13.

{69}     Fourth, on remand the parties may present evidence regarding the progress of Child's treatment and rehabilitation since entry of the 2016 disposition. *See Jones*, 2010-NMSC-012, ¶ 56; *see also State v. Doe*, 1983-NMCA-015, ¶ 23, 99 N.M. 460, 659 P2d 912 (stating that "the evidence to be considered may be that existing at the time of the latest transfer hearing, in addition to that produced at the earlier hearing"). Thus, the question the district court effectively must decide is whether Child, now twenty-one years old, *has been* "rehabilitated or treated sufficiently to protect society's interests[.]" *Rudy B.*, 2010-NMSC-045, ¶ 36.

**CONCLUSION**

{70}     We reverse and vacate the district court's order on amenability, and remand to the district court to reconsider the evidence and make another amenability determination in accordance with this opinion, including considering and making findings on the record regarding all of the Section 32A-2-20(C) factors.

{71}    **IT IS SO ORDERED.**

_____
**STEPHEN G. FRENCH, Judge**

**WE CONCUR:**

_____
**HENRY M. BOHNHOFF, Judge**

_____
**EMIL J. KIEHNE, Judge**